LANDRY, Judge.
General Gas Corporation (General) appeals the judgment of the trial court rejecting its demands against Continental Oil Company (Continental) for the sum of $23,122.17. The amount claimed represents the balance of plaintiff’s alleged proportionate ownership share of recouped well costs received by Continental as operator from three other participants in a unit well. By virtue of certain agreements with defendant, plaintiff claims entitlement to 40% of the well drilling costs paid defendant by the other parties concerned. Defendant maintains plaintiff is entitled to no part of the drilling costs and, alternatively, that plaintiff should receive only 33.11012% of the drilling costs chargeable to two of the other participants. Defendant reconvened and was awarded judgment for the sum of $50,734.27 allegedly paid in error to General as well costs which were not in fact due and owing. We find that the trial court erred in rejecting plaintiff’s demands in their entirety. We reverse the judgment of the trial court and award plaintiff judgment for 33.11012% of the well drilling costs paid by two other participants in the suit.
On September 25, 1958, General and Continental entered into an agreement styled “Conditional Sublease” (Sublease), pursuant to which Continental received 60% of General’s oil, gas and mineral rights and interests in and to a certain tract of land situated in Acadia Parish. In consideration thereof, Continental agreed to drill a well on subject property, entirely at Continental’s expense. The sublease indicates, however, that the parties obligated themselves beyond the mere exchange of mineral interests for a well drilled free of cost, as will hereinafter appear. The sublease was expressly made subject to five specifically described antecedent contracts including an operating agreement dated November 5, 1955 (Agreement #1) between Warren Petroleum Corporation (Warren) and General Gas. Another such agreement was an operating contract dated December 19, 1955 (Agreement #2) between Warren, General Gas and Sun Oil Company (Sun). Agreement #2 pooled and unitized the leasehold interest of Warren, Sun and General and recognized the percentage interest of each party in subject property to be as follows: Warren 45.734375%; General 36.437500, and Sun 17.828125. By subsequent agreement, including a letter from plaintiff to defendant dated October 4, 1960, the interests of the original participants in the well were fixed as follows: Continental 49.66518%; Sun 17.22470%, and General 33.11012%. In addition, Agreement #2, in Paragraph II thereof, provided in part as follows:
“Each party hereto shall own a like percentage in all wells on the Unit Area and in all fixtures, materials, equipment and other property acquired at the joint expense of the parties pursuant to the provisions hereof.”
Before the sublease was executed Gulf Oil Corporation (Gulf) acquired Warren’s interest which in turn was acquired by General, which concern then owned an interest aggregating 82.1718%. In the sublease General conveyed 60% of its interest to Continental as a result of which the percentage ownership became: Continental 49.66518%; Sun 17.828125%, and General Gas 33.11012%.
Agreement #1 provides that if either General or Warren elected to drill a well on the leased premises, the other party would have 15 days from written notice to such effect in which to elect to participate in the drilling operation. Failure of the party so notified to affirmatively respond in writing within the stated delay period, was equated to refusal to participate. The desiring party was then afforded 30 days in which to commence drilling of the well entirely at its own expense. Should the well prove dry, the desiring party was to bear the entire cost. In the event the well produced, the desiring party (or parties) would be owners of the well and, as such, entitled to all of the nonparticipating party’s share of the proceeds until the desiring *908 parties recouped a sum equal to 200% of the nonparticipating party’s pro rata share of the drilling costs. It was further provided that in addition the participating parties would receive 100% of the nonparticipating parties’ share of proceeds until there was paid a sum equal to 150% of the nonparticipants’ share.of operating cost during the period the 200% of drilling costs was being recouped.
The sublease between appellant and ap-pellee provided that Continental would commence drilling a well to a certain depth within 90 days of the contract date or forfeit its rights under the sublease. Additionally, the sublease stipulated it was to be executed pursuant to the terms of Agreements 1 and 2, except that it was agreed drilling costs of this particular well would be free to sublessor, General.
Continental fulfilled the terms of the sublease by drilling and completing a well on or about October 31, 1959. It is conceded the required notice of intent to drill was duly given Sun. It is also shown that by letter to Continental dated October 16, 1958, Sun declined to participate in drilling costs. The letter, (Exhibit 11-S) Tr. 160, shows a copy to General, who denies receipt thereof and a consequent lack of knowledge of Sun’s refusal to participate in drilling costs of the Navarre A-l Well.
On November 10, 1959, the Commissioner of Conservation, State of Louisiana, ordered the well and leasehold interests of General, Continental and Sun, unitized with interests of Union Texas Natural Gas Corporation (Union) and Texas Eastern Transmission Corporation (Texas). Said order, Number 307-E, required each mineral owner to pay its proportionate part of the well cost. It also designated Continental as Operator. It is conceded that as of this time, the ownership percentages of the interested parties were as follows: Continental 27.72423; General 18.24117; Sun 9.09394; Union 16.37352, and Texas 28.53717. The unitized well was denominated Homeseekers D-2 Sand No. 1 Well.
It appears the Commissioner’s unitization order necessitated a new operating agreement to cover the interests of Union and Texas who were not parties to the prior dealings between General, Continental and Sun. Continental, as Operator, was apparently assigned this task and proceeded to draft a new operating agreement for execution by all five interested parties.
On October 4, 1960, General wrote Continental indicating dissatisfaction with two aspects of a proposed new operating agreement submitted by Continental. General objected to Article II, Cost of Well. General noted that the original well was drilled subject to the sublease wherein ownership interests of the concerned parties were: Continental 49.66518%; Sun 17.22470%, and General 33.11012%. General then advanced the proposition that assuming Sun paid its proportionate part of drilling costs, all three original parties would be entitled to reimbursement of well costs from Texas and Union in amounts equal to the difference between their original ownerships and the reduced percentage of ownership resulting from the forced inclusion of Texas and Union. In addition, General objected to Article XXII of the proposed new operating agreement which suspended certain prior agreements between General, Continental and Sun. It was General’s position that the agreements sought to be suspended should be maintained insofar as concerned the jointly pooled interest of itself, Sun and Continental.
Continental replied October 19, 1960, asserting agreement with General’s entitlement to its proportionate part of well costs to be received from Union and Texas. However, Continental was of the view the allocation of drilling costs as to itself and General should not be included in the proposed unit operation agreement because it did not concern any of the other parties. Continental suggested, therefore, that allocation of drilling costs between itself and General be delineated in a separate agreement between these two parties. Additionally, Continental expressed the desire to *909 eliminate all reference to previous operating agreements in the proposed unit agreement since the joinder of Union and Texas rendered the previous agreements impracticable and cumbersome in application and enforcement.
By letter dated November 16, 1960, General informed Continental that General would agree to delete all reference to sharing of drilling costs from the new operating agreement. General further stated it would be satisfied with a separate agreement with Continental on the question of sharing drilling costs. Additionally General indicated the new agreement would provide that as per the sublease, Continental assumed General’s obligation for well drilling costs. Further, General agreed to forego all its rights under Agreements 1 and 2 as regards the well in question.
By letter dated March 13, 1961, Continental reiterated its obligation to General as follows:
“Other than those agreements which will be forwarded to you by Sun, the only remaining problem concerning General Gas is the matter of your receipt of a proportionate part of the drilling and completion costs of the unit well which will be paid to Continental by the other parties participating in the unit. This is, of course, no problem because I feel we are in full agreement with you in this matter.
As discussed in your letter dated October 4, 1960, Continental drilled the Navarre A-l well (which became the unit well for the subject unit) under provisions of the Conditional Sublease dated September 25, 1958. Upon completion of this well, General Gas owned 33.11012% therein, its portion of the well costs being paid by Continental as consideration for Continental’s earning 60% interest in the leases covered by the aforementioned Sublease.

In view of the circumstances outlined above, it is understood and agreed that the portion of the costs of the above mentioned well applicable to General Gas Corporation shall be paid by Continental Oil Company as consideration for the assignment of leasehold interest under the aforementioned Sublease. Likewise, it is understood and agreed that General Gas is entitled to receive, by virtue of its ownership in the Navarre A-l well, its proportionate part of the monies received by Continental in payment for drilling and completion costs from other parties participating in the Homeseekers D-2 Sand Unit No. 1.”
Under date of April 3, 1961, the new operating agreement (Exhibit 10), Tr. 95, was executed by the five parties concerned. Contemporaneously, General, Continental and Sun executed an agreement (Exhibit 17-S), Tr. 169, expressly suspending the five agreements, to which the sublease between General and Continental was subjected, insofar as these contracts applied to the Homeseeker’s D-2 Sand Unit No. 1 Well.
Request for payment of its proportionate share of drilling costs paid by other parties was made of Continental by General in letters dated May 18 and 19, and August 4, 1961. The obvious tenor of these letters' was that General assumed Sun had paid its share of drilling costs expended for the Navarre A-l Unit Well.
On August 7, 1961, Continental advised General the former would receive its proportionate part of monies received by the latter in payment of drilling costs already paid by participating parties. Continental also advised plaintiff that upon receipt of future payments, plaintiff would receive its proportionate part. Continental sent General a check for $42,136.37. On August 17, 1961, General wrote Continental accepting the check as part payment of drilling costs due it. General therein contended that since it had learned Sun had not participated in the Navarre A-l Unit Well, General was entitled to 40% of Sun’s pro rata drilling costs as well as the same percentage of costs due from Union and Texas.
*910 Continental’s response followed on September 28, in a letter which stated in effect that Continental had in effect “carried” or paid Sun’s drilling costs in the original well by virtue of the provisions of Agreement Number 1 which was made part of the sublease between plaintiff and defendant. Continental also asserted it mattered not whether Sun paid drilling costs before or after completion of the well.
General’s reply followed in a communication dated October 10, 1961. In substance it stated that when drilling costs were paid in there were only two owners involved, namely, Continental and General Gas who, by virtue of the sublease were entitled to share 60% and 40%, respectively, the drilling costs paid by nonparticipating parties, Sun included. General Gas then made claim for a total of $73,856.44 at the same time acknowledging receipt on account of the sum of $50,734.27.
The trial court denied appellant’s claim for an additional $23,122.27, and invoked the principle of unjust enrichment in granting Continental’s reconventional demand for return of the $50,734.27 paid plaintiff for its alleged share of drilling costs received from Union and Texas. In so holding, the lower court found that by the terms of the sublease, appellant expected to receive from appellee only a well drilled free of cost. In the opinion of the trial court it would work an inequitable result were appellant to receive both a well drilled free of cost and also a share in the drilling costs paid by Union and Texas to Continental as Operator.
The trial court rejected plaintiff’s claim for a portion of drilling costs paid by Sun on the ground that the penalty provision of Agreement #1 was no longer in force after the 1961 operating agreement became effective. In this result we concur for the reasons given by the trial court. Additionally, we concur on the finding that the separate agreement between plaintiff and defendant as to sharing drilling costs did not include those to be paid by Sun.
Appellant urges that the trial court erred in failing to hold under the admitted facts, and in accord with the applicable agreements, appellant is entitled to 40% of the reimbursed well cost payments made by the participants in the Commissioner’s Unit. Alternatively, appellant maintains that the lower court erred in refusing to award appellant 33.11012% of such costs. In the final alternative, appellant complains the trial court improperly sustained defendant’s reconventional demand for the return of drilling costs paid by appellee to appellant.
In the normal course of events mere ownership in pooled or unitized lands or mineral interests therein does not entitle the owners to share in drilling costs paid the operator by other participants in the pool or unit. Superior Oil Co. v. Humble Oil & Refining Company, La.App., 165 So.2d 905. Granted such proprietors possess certain aspects of “ownership”. Included are the right to each participant’s pro rata share of oil, gas and minerals produced. Coupled with such right is the correlative obligation for a like percentage of drilling and operating costs.
LSA-R.S. 30:10, subd. A (1) (c) provides that when two or more tracts are unitized or pooled by Commissioner order, if the parties have not agreed to pool their interests, the Commissioner shall require development as a drilling unit when necessary to prevent waste or unnecessary drilling. The statute further provides that in such instances the operator shall be reimbursed reasonable development and operation costs from each participant according to his pro rata share of ownership in the pool.
We find no statutory authority entitling an owner to a portion of the operator’s share of drilling costs reimbursed by participants joined in a unit as the result of a Commissioner order. In such instances those participants having previously paid their pro rata share are entitled only to a refund from the operator based *911 on their reduced fractional obligation to contribute to drilling costs. This principle is not applicable herein because General has in fact made no cash contribution to drilling costs. Moreover, the contract between plaintiff and defendant provides the latter shall pay the former’s share of such costs, whatever they might be. There appears no legal inpediment, however, why an operator and owner may not expressly contract to the contrary, where some mutual interest of each is thereby served. Therefore, if General is entitled to a percentage share of drilling costs paid by Union, Texas and Sun, it can only be by virtue of some independent agreement with defendant.
In the absence of express contractual provisions to the contrary, we find no legal reason why the owners of unitized lands should recover from the operator for diminution of their interest in a pool by virtue of forced unitization bringing in additional participants. Presumably, the diminution in interest is offset by the larger area being incorporated into the common pool. Thus the owner of a reduced percentage interest will be compensated therefor by sharing in the production from a larger production unit.
It is undisputed that the sublease was made subject to Agreement #2. Subsection II thereof (hereinabove quoted in relevant part) expressly provided that each signatory to the contract owned a percentage in all wells drilled and also in all fixtures, equipment and materials acquired at the joint expense of the parties. Construing the two agreements together, we conclude that, as between plaintiff and defendant herein, plaintiff was to receive not only a well drilled free of costs, but also part ownership in the fixtures, equipment and material acquired at joint expense and all other benefits accruing thereunder.
If there were any ambiguity in the agreements, it was resolved by the construction subsequently placed thereon by the parties themselves. In this regard, we note the provisions of LSA-C.C. Article 1956 which states that when the meaning of a contract is doubtful, the construction put on it by the parties and the manner of its execution by one party with the express or implied consent of the other, furnishes the rule for interpretation of the contract terms.
We observe appellant’s communication of October 4, 1960, objecting to the proposed operating agreement insofar as Article II thereof stated the parties would own their proportionate part of the Commissioner unit well. We likewise recall plaintiff’s objection to Article XXII which purported to suspend the provisions of all former agreements. It seems that appellant recognized that the proposed 1961 operating agreement could be construed to change the ownership provisions of Agreement #2, because the proposed 1961 operating agreement utilized and defined the term “well” in such a general manner as to imply ownership merely in the unit or pool per se. This conclusion finds support in the fact that plaintiff’s letter of October 4, 1960, makes ownership in the well the basis for its claim to its pro rata share of well drilling costs contributed by Union and Texas.
We conclude the correspondence between plaintiff and defendant effected a separate contract between the parties concerning the sharing of drilling costs.
Plaintiff’s letter of November 16, 1960, agreed to delete all reference to well drilling costs from the proposed agreement and negotiate an independent contract on this phase of the parties’ relationship. Continental’s letter of March 13, 1960 (preceding execution of the new agreement) clearly concedes plaintiff’s part ownership in the well drilled at Continental’s expense. It also recognized that plaintiff’s ownership interest entitled plaintiff to 33.11012% of reimbursed drilling costs received by Continental from Texas and Union.
The net effect of these several communications was an offer by Continental *912 to General of a percentage of drilling costs in return for the latter’s relinquishment of its rights to well ownership as specified in Agreement #2. It also appears the offer was accepted by plaintiff’s execution of the new operating agreement containing terms which seemingly changed the nature and extent of plaintiff’s well ownership rights from those specified in Agreement #2. When plaintiff signed the new operating agreement it exchanged the rights conferred by the prior agreements for a specified portion of well drilling costs. It appears from the correspondence that the parties intended the amount to be paid plaintiff was 33.11012% of the drilling costs paid by the forced unit participants, Union and Texas.
We find nothing to indicate the parties intended that plaintiff would share in the percentage of drilling costs paid by Sun. On August 7, 1961, defendant informed plaintiff that Sun had not yet paid its share of drilling costs. Plaintiff’s reply of August 17, 1961, indicated surprise in this respect and informed defendant that plaintiff’s demanded percentage of costs was postulated on the assumption Sun had previously paid its share of drilling costs. Plaintiff thereupon, for the first time, demanded of defendant 40% of the drilling costs paid defendant not only by Texas and Union but also Sun as well. Plaintiff stated its position as follows:
“Now that we find that Sun did not participate in the drilling of the well then upon completion of the well, prior to the formation of a producing unit by the Department of Conservation the ownership of the well was 60% by Continental and 40% by General Gas, with payment of our 40% of the cost being accomplished by assignment of 60% of our interest in the leases to Continental.”
It is noteworthy that plaintiff signed the operating agreement of April 3, 1961, prior to demanding any portion of the drilling costs paid by Sun to Continental. Also pertinent is the fact that the 1961 operating agreement contemplates the parties paying drilling costs after signature inasmuch as Subsection II of the agreement stipulates:
“Upon the execution of this instrument, all parties agree to bear their proportionate part of this amount, if such amount has not previously' been paid, provided, however, that Continental Oil Company shall bear the proportionate part of such drilling and completion costs allocated hereunder to General Gas Corporation.”
Moreover, Subsection IV of this particular agreement, entitled Ownership and Costs, is devoid of language indicating intent to suspend well ownership pending the parties’ payment of their respective shares of drilling costs. More particularly, payment of costs is expressly made subject to attached Exhibit C, entitled Accounting Procedure, which makes no provision for suspension of well ownership contingent upon payment of drilling costs. Contrarily, Subsection I, paragraph 3 of Exhibit C provides:
“3. Payments by Non-Operator
Each party shall pay its proportion of all such bills within fifteen (15) days after receipt thereof. If payment is not made within such time, the unpaid balance shall bear interest at the rate of six per cent (6%) per annum until paid.”
Notwithstanding the foregoing, plaintiff in effect urges that the independent contract with defendant regarding sharing of well drilling costs should be construed in the light of Subsection VIII of Agreement #1 which rendered well ownership contingent upon payment of drilling costs. Plaintiff seeks 40% of the well drilling costs attributable to Sun on the premise that since Sun did not pay, there were only two owners, namely, plaintiff and defendant. On the same basis, 40% is claimed of costs paid by Texas and Union.
*913 In executing the April 3, 1961 agreement, plaintiff abrogated all prior operating agreements thereby rendering their terms inoperative. In relinquishing its rights under the previous agreements, plaintiff received as consideration all rights conferred by the 1961 agreement and the independent agreement whereby defendant bound itself to pay plaintiff a stipulated percentage of the drilling costs paid by Union and Texas.
Plaintiff’s letter of October 4, 1960, expressly negates the contention that the independent agreement with defendant encompassed plaintiff sharing in drilling costs paid by Sun. In this regard, the letter states:
“Prior to the establishing of a producing unit by the Louisiana Department of Conservation for the Navarre A-l Well, the owners of the working interest also owned the well in the proportions set out above. Any revision of the ownership would require that other parties coming in to the unit pay their pro rata cost of the well to the owners.”
The contract effected between plaintiff and defendant by the mentioned communications does not contemplate plaintiff sharing in drilling costs contributed to defendant, as Operator, by Sun. It follows that plaintiff is not entitled to a share thereof. We also find the intent of the parties was that plaintiff, as a participant and owner of a 33.11012% interest in the Commissioner created unit would receive that percentage of contributed drilling costs paid defendant by Texas and Union, and not the 40% claimed by plaintiff.
It is stipulated that drilling costs attributable to Texas and Union aggregate the sum of $153,549.03, and that 33.11012% thereof amounts to $50,734.27, which sum defendant had paid plaintiff.
Accordingly, it is ordered, adjudged and decreed that the judgment of the trial court rejecting the claim of plaintiff, General Gas Corporation, for judgment against defendant Continental Oil Company, in the sum of $23,122.17, is affirmed.
It is further ordered, adjudged and decreed that the judgment of the trial court granting judgment on the reconventional demand of defendant Continental Oil Company against defendant in reconvention, General Gas Corporation, be and the same is hereby reversed and judgment rendered herein rejecting said reconventional demand.
It is further ordered, adjudged and decreed that all costs of these proceedings in both the trial and appellate court be paid equally by plaintiff and defendant.
Amended and rendered.