397 So.2d 1376 (1981)
Bryan J. SLOANE, Jr., Plaintiff and Appellant,
v.
Edward Mike DAVIS, d/b/a Tiger Oil Company, Defendant and Appellee.
No. 8079.
Court of Appeal of Louisiana, Third Circuit.
April 15, 1981.
*1377 Dubuisson & Dubuisson, James G. Dubuisson, Opelousas, for plaintiff and appellant.
Camp, Carmouche, Palmer, Barsh & Hunter by A. J. Gray, III, Lake Charles, for defendant and appellee.
Before CULPEPPER, FORET and STOKER, JJ.
CULPEPPER, Judge.
This is an action to enforce an employment contract. Plaintiff, Bryan J. Sloane, Jr., a geologist, seeks to compel his former employer, Edward Mike Davis, d/b/a Tiger Oil Company, an independent oil operator, to assign to him certain overriding royalty payments from the "Mecom prospect". Plaintiff's claim is based on the provisions of a written employment contract made with defendant. Upon joint motion of counsel, the trial of this matter was severed and heard solely on the question of liability under the contract. The question of damages, if any, was to be tried at a later date. After two days of testimony, the district court rendered judgment in favor of defendant and dismissed plaintiff's suit. Plaintiff appeals. We reverse and remand.
The trial judge held the written contract is ambiguous as to the provisions at issue, thus permitting consideration of parol evidence to show the intent of the parties. Moreover, the judge held that even if the contract is not ambiguous, plaintiff cannot recover because the Mecom lease was not acquired as the result of services performed by plaintiff or a co-employee in his office. On appeal, defendant does not contend the contract is ambiguous. He contends plaintiff did not comply with the contract as written.
*1378 On October 5, 1973, plaintiff was hired as a geologist by the defendant, Edward Davis. The terms of the employment contract were provided in a letter agreement signed by plaintiff and defendant. Under the agreement, plaintiff was to receive a minimum salary of $1800.00 per month for a minimum term ending no sooner than December 31, 1974. In addition to the base salary, plaintiff was granted an option to purchase an overriding royalty on any mineral leases acquired by the defendant in certain instances. The pertinent provisions of the October 5, 1973 contract provide:
"Furthermore, employer hereby grants to employee the option of purchasing an overriding royalty on all oil, gas and mineral leases acquired by employer as a result of employee's services or as a result of efforts of other members of the office wherein employee renders his services. Employee's cost of said overriding royalty shall be $10 per prospect.
"The amount of overriding royalty available to employee is described by the following paragraphs:
"(1) On prospects generated by employee he shall be entitled to acquire 1% of 8/8ths overriding royalty.
(2) On prospects generated by any member of South Louisiana Division other than employee, employee shall be entitled to acquire 0.5% of 8/8ths overriding royalty."
In the spring of 1975, plaintiff's employer, Davis, entered into discussions with John Mecom, Sr., concerning oil and gas exploration on property owned by Mecom's family in Cameron Parish, Louisiana. Defendant assigned plaintiff to conduct a geological study of the area to determine the feasibility of the venture. Plaintiff was also instructed by defendant to consult with Mr. Lee Morgan, a geologist in New Orleans working for Mr. Mecom. Plaintiff met with Mr. Morgan in New Orleans and obtained certain geological maps which Morgan had already prepared. These maps designated several oil and gas prospects on the land. Based on this information and on additional geological information prepared by plaintiff, plaintiff made several maps of the subsurface area.
After his geological study was complete, plaintiff submitted a written report to Joe Freeman, his immediate supervisor in the Lake Charles office, recommending that Tiger Oil Company join Mr. Mecom in the drilling venture. After consideration of plaintiff's proposal, which was concurred in by Joe Freeman, Tiger Oil Company and John Mecom entered into a mineral lease on August 14, 1975. Drilling was commenced soon thereafter on one of the prospects and production was obtained.
On March 16, 1976, in a letter agreement signed by plaintiff and defendant, the October 5, 1973 employment agreement was changed. The opening paragraph of the March 16, 1976 agreement provides:
"This letter will supersede and replace that certain Letter Agreement dated October 5, 1973, by and between Bryan J. Sloane, Jr. (hereinafter referred to as `employee') and Edward Mike Davis (hereinafter referred to as `Davis'). All terms and conditions hereinafter set forth shall be effective as of October 5, 1973."
Under the second agreement, plaintiff's salary remained at $1800.00 per month. The conditions necessary to acquire an option to purchase an overriding royalty, however, were changed by the amended contract which now reads in pertinent part as follows:
"Furthermore, Davis hereby grants to employee the option of purchasing an overriding royalty on all oil, gas and mineral leases acquired by Davis as a result of employee's services or as a result of efforts of other members of the office wherein employee renders his services. Employee's cost of said overriding royalty shall be $10 per prospect.
"At any time that over $150 per acre bonus or consideration is paid for acquiring leases, then the overriding royalty amount to be received by employee shall be negotiated between employee and Davis. However, it shall never exceed 1% of 8/8ths. The amount of overriding royalty available to employee is described by the following paragraphs:

*1379 "(1) On prospects generated by employee, he shall be entitled to receive 1% of 8/8ths overriding royalty, so long as the royalty and/or overriding royalty interest (excluding the employee's overriding royalty) shall not exceed a 1/6th total royalty. If Davis gives more than a 1/6th royalty and/or overriding royalty interest, then the overriding royalty interest hereinabove provided for shall be proportionately reduced.
"(2) On any prospect reviewed and interpreted by employee, other than his own original prospects, as defined in paragraph 1 above, located in South Louisiana which, for purpose of this letter, shall embrace an area located on the northern boundaries of Beauregard, Allen, Evangeline, St. Landry, Point Coupee, West Feliciana, East Feliciana, St. Helena, Tangipahoa and Washington Parishes, Louisiana, to the southern boundary of Zone 1, employee shall receive a ½ of 1% of 8/8ths overriding royalty interest. However, any prospect, whether it be self-generated and be deemed the prospect of employee, or any other prospect reviewed and interpreted by employee not being his prospect, shall be sent by registered mail to Davis for his approval by the division manager. Such prospect shall include the terms and conditions of the entire prospect, delineated by section, township and range, or by outline, along with the amount of overriding royalty to be received by employee. Should Davis concur, he shall return a copy to the division manager, appropriately signed, and retain a copy in the Houston Office."
The parties agree it is this agreement, rather than the October 5, 1973 agreement, which is now controlling. Moreover, plaintiff makes no claim under paragraph number (1) above, since he admittedly did not "generate" the Mecom prospect. Plaintiff only claims under paragraph (2) that he "reviewed and interpreted" the Mecom prospect, and that Davis acquired the Mecom lease as a result of plaintiff's services.
On November 4, 1976, plaintiff mailed a letter to defendant seeking assignment under the above agreement of overriding royalty "earned" by him under the Mecom lease and under another lease in St. Landry Parish. Plaintiff was informed by a letter of date November 15, 1976 from defendant's attorney in Houston that Davis agreed to assign to plaintiff an override under the lease in St. Landry Parish, which plaintiff "generated", but that defendant refused to assign to plaintiff any royalty from the Mecom lease for two reasons. The first was that the lease had been generated solely through the efforts of Davis himself. The second was that the conditions of paragraph (2) of the March 16 agreement regarding notice by registered mail had not been complied with.
Since the defendant does not contend on appeal that the 1976 contract is ambiguous as to the provisions at issue, we will not discuss this question. We will only say in passing that we have carefully studied the trial judge's written reasons and we find the contract free of ambiguity or contradiction as to the provisions on which plaintiff relies, which provisions are discussed below.
Since the 1976 contract is not ambiguous, we will not consider the parol evidence introduced for the purpose of showing the intent of the parties was that the Mecom prospect was excluded from plaintiff's employment contract. LSA-C.C. Article 2276 provides:
"Art. 2276. Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since."
In Capizzo v. Traders & General Insurance Company, 191 So.2d 183 (La.App. 3rd Cir. 1966) we construed Article 2276 as follows:
"The general rule is that when the provisions of a written contract are clear and unambiguous, the contract cannot be varied, explained or contradicted by parol evidence, and the meaning or intent of the contracting parties must be sought within the four corners of the instrument. One of the exceptions to this general rule *1380 is that when the terms of a written contract are susceptible of more than one interpretation, or where there is uncertainty or ambiguity as to the provisions of the contract, or where the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguities and to show the intentions of the parties. LSA-C.C. art. 2276; Gulf States Finance Corp. v. Airline Auto Sales, Inc., 248 La. 591, 181 So.2d 36; SnowWhite Roofs, Inc. v. Boucher, 182 So.2d 846 (La.App. 4th Cir. 1966); Marcann Outdoor, Inc. v. Hargrove, 140 So.2d 815 (La.App. 3d Cir. 1962)."
We will now review plaintiff's contention that he has complied with the contract as written. Plaintiff first points out that in the original 1973 contract, Sloane was to receive an overriding royalty on all leases acquired by Davis as a result of Sloane's services or as a result of efforts of other members of the office wherein Sloane renders his services, the amount of royalty being (1) 1% of 8/8ths on prospects generated by Sloane and (2) 0.5% of 8/8ths on prospects generated by any member of the South Louisiana Division other than Sloane. Plaintiff admits that the Mecom prospect was "generated" by Davis himself, not by Sloane or any member of the South Louisiana Division. Thus, plaintiff admits he would not have been entitled to any overriding royalty on the Mecom lease under the 1973 contract.
However, plaintiff points out that the 1976 contract changes the agreement as to the provisions at issue here, i. e., as to prospects not generated by Sloane. Under the 1976 letter agreement, Sloane was entitled to overriding royalty of ½ of 1% of 8/8 ths "(2) On any prospect reviewed and interpreted by employee (Sloane), other than his own original prospects." (emphasis supplied) It is also important at this point to note that under the express provisions of the 1976 contract it was made retroactive to October 5, 1973, so it covered the time during which the Mecom prospect was reviewed and interpreted by Sloane and was acquired by Davis.
Plaintiff points out that three geologists, other than plaintiff himself, testified they considered the work done by Sloane on the Mecom prospect did constitute "review and interpretation." In his deposition, Mr. Lee Morgan, the above mentioned geologist for Davis, testified as follows regarding the work which he and Sloane performed on the Mecom prospect:
"A Mr. Sloane showed me the maps that he prepared in that office.
MR. GRAY:
I object. You testified previously that Mr. Sloane had shown you maps.
MR. DUBUISSON:
That is right. Go ahead and answer.
"A I don't understand. All I can say is that I was shown some maps at the conclusion of the study and during the study by Mr. Sloane while I was in that office with him and that they were an interpretation of the area that we were discussing, the East Mud Lake, the second Bayou and Mud Lake Field areas of Cameron Parish.
BY MR. DUBUISSON:
"Q When you say an interpretation, was that interpretation by you or by someone presenting them for Mike Davis?
"A It was an interpretation that he had prepared there.
"Q When you say `he,' who do you mean?
"A I should have said that Mr. Sloane and Mr. Blades had prepared this together, and Mr. Freeman also collaborated in the early stages of it.
"Q You have used the word `interpretation.' What does that mean in your field?
"A An interpretation is what the geologist believes to occur between specific points where he has information. He has information generally at the well bores, and he interprets what happens between the well bores and shows it by contours, so an interpretation of a geologic map is one which displays the information which is known and then attempts to extend that information *1381 over a broader area where the information cannot really be known. It is there for rather a permanent (sic) thing and it's very rare for two geologists to come up with identical interpretations even though the data is the same.
"Q Had you yourself prepared an interpretation of this area?
"A Yes. That was the interpretation or the interpretations. There were several different maps which I showed to the people who were assembled there the second time and to Mr. Sloane the first time.
"Q Did you consult
MR. GRAY:
"Who is `you,' please?
BY MR. DUBUISSON:
"Q Did you, Mr. Sloane, Mr. Blades and Mr. Freeman, when he was there, consult on a joint interpretation of this area?
"A I was made familiar with their interpretation, but I had no part in preparing it. That was their interpretation. I had my own.
"Q What I'm getting at is, what did the four of you
MR. DUBUISSON:
If you want me to name them again
MR. GRAY:
No, that is satisfactory.
BY MR. DUBUISSON:
"Q (Continuing)discuss after Mr. Sloane showed you his interpretation map? Do you recall?
"A Yes. Although I cannot recall the specific wording or who said what to whom, but I was left with the impression which overjoyed methat is why I remember itthat they liked all five drilling prospects, and I was delighted, and I was left with the impressionI can't say for certain that I was told this specifically, but I was left with the impression, which I phoned to Mr. Mecom, that they liked the prospects and were going to recommend their drilling.
I think this was mostly from Mr. Sloane because Dewey was not much of a talker. He would tell them, `Say anything.'"
Mr. Adam Sturlese, a consulting geologist, was in court during the trial and heard the testimony of plaintiff as to the work he did. In answer to a question as to whether plaintiff's work constituted "geological review and interpretation", Sturlese stated "Yes sir. That would be a geological review and interpretation."
Also, Mr. Joe Freeman, plaintiff's immediate superior during the time that plaintiff worked for Davis, testified as follows:
"Q What is the purpose of studying the logs or wells ... existing wells in the are and corings from those areas and any other type of material you might have which would give you information as to the geological structure?
"A If it would please the Court and you, sir, I agree in context with what Mr. Sloane said as far as the interpretation of the logs, what you have to do, the base maps and also with Mr. Adam Sturlese. I have no disagreement with that. I would be repeating what they said, so I agree with them, if it would save time and please the Court.
"Q In other words, you agree that Mr. Sloane reviewed the possibility of discovering oil and gas on the Mecom Tract?
"A Yes, sir."
From this testimony, it is clear that plaintiff "reviewed and interpreted" the Mecom prospect. There is no testimony to the contrary.
Having determined that plaintiff did "review and interpret" the Mecom prospect within the meaning of the contract, the next issue presented by the parties on appeal relates to the provision in the introductory paragraph of the 1976 agreement quoted above, which states that Sloane is entitled to royalty on mineral leases "acquired by Davis as a result of employee's services." Plaintiff contends Davis did acquire the Mecom lease as a result of plaintiff's services in reviewing and interpreting the prospect. As described in more detail above, *1382 defendant called plaintiff in the spring of 1975 from Mecom's office in Houston. He instructed plaintiff to conduct a geological study of the Mecom property and then to go to New Orleans to discuss the prospect with Lee Morgan, the geologist for Mecom. On returning from the conference in New Orleans with Morgan, plaintiff gathered geological information, prepared maps and recommended strongly to Davis to drill five of the Mecom prospects. Regarding the results of Sloane's recommendations, Mr. Freeman testified as follows:
"Q Mr. Freeman, did you concur in Mr. Sloane's recommendations?
"A Yes.
"Q As a result of your concurrence in those recommendations, did you make any recommendations to Mr. Davis or his chief geologist, Mr. Derr?
"A Yes, I did. However, prior to that recommendation I did review the data myself, and reviewed Mr. Sloane's interpretation and very similar to what he did with his before I made ... probably didn't go into the detail, but I did review it myself before I made that recommendation to Mr. Derr and Mr. Davis.
"Q And you made the same recommendation that Mr. Sloane did?
"A That's correct.
"Q And subsequently, Mr. Davis did proceed to execute a lease with Mr. Mecom; is that correct, sir?
"A That's correct."
Defendant argues Davis did not acquire the Mecom lease as a result of Sloane's service. He stresses the fact that Davis had already initiated discussions with Mecom before Sloane was assigned to study the prospects. In his brief, defendant even states that Mecom and Davis had "made their deal" before Sloane started work on the Mecom property. According to defendant, the services performed by Sloane on the Mecom prospect were simply routine duties for which he received a salary of $1800.00 per month.
We cannot agree with defendant's position. The contract clearly states that Sloane is entitled to royalty on leases "acquired by employer as a result of employee's services, or "as a result of efforts of other members of the office wherein employee renders his services." The evidence, as outlined above, shows that Davis did acquire the Mecom lease as a result of Sloane's services, or at least as a result of the combined services of Sloane and Joe Freeman. Since Davis himself did not testify, there is no testimony to the contrary.
The final issue urged by defendant in his brief is that plaintiff failed to comply with the notice provision set forth in numbered paragraph (2) of the 1976 agreement, requiring that Sloane notify Davis by registered mail of Sloane's intent to exercise his option to acquire royalty. The record shows that on November 4, 1976, plaintiff mailed a letter to Davis requesting assignment of an overriding royalty under a lease in St. Landry Parish and also under the Mecom lease in Cameron Parish. Obviously, Davis received this notice, because his attorney answered plaintiff's request by letter of date November 15, 1976 stating that Davis agreed to transfer to plaintiff an override on the St. Landry lease, which had been generated by plaintiff, but that Davis refused to transfer to plaintiff royalty under the Mecom lease. The contract does not state a time limit within which Sloane was required to give notice. However, it is clear that the notice was given within a reasonable time. In our view, the mere failure of plaintiff to give notice by "registered mail" is not sufficient to defeat the plaintiff's claim, where the notice was actually received by defendant.
During oral argument before our Court, defendant made an additional argument that plaintiff's failure to formally object to certain parol evidence introduced at trial regarding the intent of the parties to exclude the Mecom lease from the contract, constituted a waiver of plaintiff's right to rely on the written contract alone. This contention has no merit. Jurisprudence construing LSA-C.C. Article 2276 holds that even though not objected to, parol evidence *1383 cannot be used to vary or add to the terms of an unambiguous written agreement. Vales v. Doley, 297 So.2d 532 (La. App. 4th Cir. 1974); Cookmeyer v. Cookmeyer, 274 So.2d 739 (La.App. 4th Cir. 1973); and Little v. Haik, 246 La. 121, 163 So.2d 558 (1964).
For the reasons assigned, the judgment appealed is reversed and set aside. This case is remanded to the district court for further proceedings, in accordance with the stipulation of the parties for a bifurcated trial and in accordance with law and the views expressed herein. All costs of this appeal are assessed against the defendant-appellee. Assessment of costs in the trial court must await a final judgment there.
REVERSED AND REMANDED.
STOKER, J., concurs and assigns written reasons.
STOKER, Judge, concurring.
I concur in the result reached in the majority opinion but with respect disagree with certain conclusions stated by the majority in reaching that result. The majority opinion finds that the contract of March 16, 1976 (Second Letter Agreement) was free of ambiguity or contradiction. With this I do not agree, as the second contract appears to me to be quite ambiguous and contradictory.
In other respects I agree with the views of the majority. There can hardly be any question but that the Mecom prospect was "generated" by Davis himself rather than Sloane or any member of the "office wherein employee (Sloane) rendered his services." I am also satisfied that the evidence establishes that Sloane did review and interpret the Mecom prospect. Under these circumstances it seems to me to be reasonable to hold that the Mecom contract was "acquired by Davis as a result of employees' (Slone's) services." These conclusions which I share with the majority form the basic facts of this case. The issue as I see it is in interpretation of the contract in question, that is, the second contract of employment entered into March 16, 1976.
The second contract is ambiguous but because it was drafted by Davis or his representatives, it should be construed against him. It is possible, in considering the provisions of the contract within its four corners, to construe it as urged by either party. The intent of the parties as reflected in the writing itself can be found to be as the majority opinion finds. This interpretation restricted Sloane insofar as the new contract required that he perform services (review and interpret) with respect to leases he did not generate. However, it broadened Sloane's opportunities insofar as it extended his option rights to leases generated by Davis, his employer.
We derive no help from any parol evidence seeking to establish what was understood at the time Mecom and Davis negotiated. Such parol predated the amended second contract.[1] Therefore, it could not have related to how the second contract was to be construed. No parol evidence is directed to the intention of the parties in confecting the second contract or as to how it should be construed. However, since the second contract came after the Mecom-Davis negotiations, it may be construed as affecting all leases generated by Davis without aid from any employee. The amended contract was made retroactive to the date of the original contract. Therefore, it can reasonably be assumed that the amended contract was made with the Mecom-Davis lease or contract in mind, and it was intended to give Sloane rights in that contract which he did not have under the original option contract.
NOTES
[1] The Mecom-Davis discussions occurred in the spring of 1975. The lease between Mecom and Tiger Oil Company (Davis) was entered into on August 15, 1975. The second letter agreement relating to options to purchase overriding royalties was entered into by Davis and Sloane on March 16, 1976. Its terms and conditions were made effective as of October 5, 1973, that is, retroactive to that date.