Sidney E. BROWNING, Fannie Richard, Virginia Browning, Kenneth Ray Browning, Sidney Maurice Browning, James D. Browning, Nancy Browning, Ethel Browning, Sylvia Browning, Roxie Browning, Brenda Browning, Broadhurst, Brook, Mangham & Hardy, and Sonnier, Hebert & Hebert

v.

EXXON CORPORATION.

Civ. A. No. 93–156–A.

United States District Court,
M.D. Louisiana.

April 4, 1994.

Larry Charles Hebert, Sonnier, Hebert & Hebert, Abbeville, LA, for plaintiffs.

William Henry Bennett, III, Robert B. McNeal, Exxon, New Orleans, LA, for defendant.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

JOHN V. PARKER, Chief Judge.

This matter is before the court upon a motion for summary judgment filed on behalf of plaintiffs and upon a motion for summary judgment filed on behalf of defendant. Both motions are opposed. The court has reviewed the matter and concludes that there is no need for oral argument. Removal jurisdiction is based upon diversity of citizenship under 28 U.S.C. § 1332.

This case involves a dispute between the owners of an unleased tract of land and the operator of a "Tuscaloosa Trend" unit well. The dispute is over responsibility for drilling and production costs. The significant issue is whether the use by the parties of **certified mail** is the substantial equivalent of **registered mail** which is required by the Louisiana statute. Needless to say, in this diversity case the court looks to state law.

Plaintiffs are the co-owners of the land and mineral rights in a tract of land, a portion of which is included in a production unit established by the Louisiana Commissioner of Conservation. Plaintiffs brought this action in the Nineteenth Judicial District Court for the Parish of East Baton Rouge, Louisiana seeking to recover drilling-production costs which Exxon has allegedly improperly withheld from the value of production otherwise

due them. Exxon removed the action to this court.

### The Undisputed Facts

By instrument dated April 8, 1976, plaintiff, Sidney E. Browning, executed an oil, gas and mineral lease in favor of C.T. Carden which covered 45.38 acres in Section 38, Township 6 South, Range 2 East, East Baton Rouge, Louisiana. This lease includes the 6.746 acre tract at issue here. A one-half interest in the lease was assigned to Sabine Production Company[1]. Several years later Sabine entered an agreement, known in the oil industry as a farmout agreement, with Exxon, under the terms of which Exxon was granted the right to obtain an interest in certain leases, including the Browning lease, by drilling a producing well at an agreed location and depth and complying with the other provisions of the agreement.

The Browning lease is the usual Louisiana form providing for a specified payment called a bonus in the oil industry, and for a primary term during which the lessee can extend the lease for a series of successive one year periods either by drilling or by making specified payments of money, referred to as delay rentals. The primary term of the Browning lease was five years. The lease cannot be extended beyond the primary term unless there is production of minerals before the expiration of the primary term either from the leased property or from lands pooled with that property. Thus, the expiration of the five year primary term of the Browning lease was April 8, 1981. The lease provides for a payment of royalty to the landowner-lessor of one-eighth of all the oil or gas produced from the property.

The Exxon–T.J. Strain No. 1 Well was spudded on July 12, 1980, in Section 38 but not on any part of the Browning lease. On April 20, 1981 (after expiration of the Browning lease) the Louisiana Commissioner of Conservation issued Order No. 1124 which established the 18,000 foot TUSC RA SUA unit in the Comite Field, East Baton Rouge Parish. Exxon was named operator for that

---

1. The other one-half interest was assigned to Exchange Oil & Gas, Inc. The plaintiffs concede that they have been unable to verify whether Exxon also entered into a farmout agreement with Exchange.

unit and the T.J. Strain No. 1 Well was designated as the unit well. A portion of the Browning land was included by the Commissioner within the 18,000 foot unit and designated on the survey plat as Unit Tract 4. That tract contributed 6.746 acres to the 640 acre unit for a participation factor of 1.05406 percent. It is undisputed that following completion of the well, Exxon retained drilling and production costs attributable to the Browning property from monies otherwise due the landowners.

On July 22, 1986, an attorney, Mr. Samuel Masur, sent a letter to Chevron by certified mail on behalf of "Sidney E. Browning, et al, owners of Tract No. 4" requesting a sworn, itemized statement of drilling and operating costs for the Strain well. The letter was received by Exxon on July 25, 1986. A second letter was sent by Mr. Masur, again by certified mail, on August 22, 1986, which was received by Exxon on August 29, 1986. On that same date, August 29, 1986, Exxon responded to the first letter, using certified mail, and stating that the total drilling costs were $16,621,634.66.

This action was commenced on February 8, 1993, by Sidney E. Browning, his wife, Fannie Richard, the nine Browning children, the Sonnier law firm and the Broadhurst law firm [2] against Exxon to recover the pro rata share of production costs attributable to the Browning property included within the unit in the amount of $175,202 [3].

### Contentions of the Parties

Plaintiffs contend that Exxon forfeited its statutory right to demand a contribution from the Brownings for the cost of drilling operations of the Strain well because of its failure to timely respond to the notice furnished by the landowners through their attorneys pursuant to LSA–R.S. 30:103.2. Exxon contends that no such forfeiture occurred because the attorney for the landowners did not use **registered** as opposed to **certified** mail, as required by the statute. Alternatively, the plaintiffs contend that if Exxon has not forfeited its right to demand contribution for the proportionate share of well costs, then Exxon's recovery should be limited to one-half of those costs. This argument is predicated upon the well-established proposition that it is the obligation of the lessee under a Louisiana mineral lease to bear the drilling costs incurred in exploratory operations. Plaintiff's argument is that under the farmout agreement, which they equate to the sale of a hope, Exxon agreed to pay the costs of drilling which would otherwise have been born by Sabine, the mineral lessee, and since "the Strain Well was planned, proposed and drilled" before expiration of the lease, Exxon should be held responsible for development and operational costs. Exxon responds that the argument falls of its own weight. Exxon is correct, as we shall see, infra.

### The Forfeiture Argument

The primary argument advanced by plaintiffs is that Exxon has forfeited its right to recoup the drilling costs to which it otherwise would have been entitled under Louisiana law because it failed to respond to the July 22, 1986 letter within fifteen days as required by Louisiana statute. See *Rivers v. Sun Oil Co.*, 503 So.2d 1036 (La.App. 2d Cir.1987). Plaintiffs concede that, while the owners of land which is not subject to a mineral lease but is included within pooled or unitized lands, have the right to their pro rata share of minerals produced, they also have the correlative obligation to bear a percentage of the drilling and operating costs. As the court commented in *General Gas Corp. v. Continental Oil Co.*, 230 So.2d 906, 910 (La. App. 1st Cir.1970):

"LSA–R.S. 30:10, subd. A(1)(c) provides that when two or more tracts are unitized or pooled by Commissioner order, if the

**2.** Following execution of the lease, Mr. and Mrs. Browning transferred interests in the land to their nine children. After the expiration of the lease, all of the Brownings transferred a mineral servitude covering an undivided portion of the mineral rights to the two law firms named in the text. Exxon has not challenged ownership of the land or mineral rights and a detailed recitation of precisely how these conveyances were made is not germane to resolution of the issues before the court.

**3.** Exxon claims that the amount should be $175,-292, but this minor dispute of fact does not amount to a material fact for summary judgment purposes.

parties have not agreed to pool their interests, the Commissioner shall require development as a drilling unit when necessary to prevent waste or unnecessary drilling. The statute further provides that in such instances the operator shall be reimbursed reasonable development and operation costs from each participant according to his pro rata share of ownership in the pool."

Since it is undisputed that at the time the Commissioner formed the unit which includes a portion of the Browning property, there was no oil, gas and mineral lease affecting that property, the owners of that tract are entitled to their proportionate share of the oil or gas produced and they have the correlative obligation of paying their proportionate share of drilling and production costs.

LSA–R.S. 30:103.1 requires the operator of a unit well which includes unleased land to report drilling costs within ninety calendar days from completion of the well and requires that the reports be sent by registered mail "to each owner of an unleased oil or gas interest who has requested such report and furnished his name and address to the operator or producer."

The forfeiture provision relied upon by plaintiff is Section 103.2 which reads as follows:

"Whenever the operator or producer permits (1) ninety calendar days to elapse from completion of the well and (2) fifteen additional calendar days to elapse from date of receipt of written notice by **registered mail** from the owner or owners of unleased oil and gas interests calling attention to failure to comply with the provisions of R.S. 30:103.1, such operator or producer shall forfeit his right to demand contribution from the owner or owners of the unleased oil and gas interests for the cost of the drilling operations of the well." (emphasis supplied)

■ Thus, under the Louisiana statutory scheme, the operator of a unit well which includes unleased acreage is required to report production costs by registered mail within ninety days after completion of the well to the owners of the unleased acreage who have requested a report by registered mail. If the operator fails to timely report such drilling costs and the owners of unleased interests call that failure to the operator's attention by registered mail and the operator allows fifteen calendar days to elapse from the date of receipt of that notice, the operator forfeits his right to demand contribution of drilling costs from those owners.

It is, of course, undisputed that in the case before the court, neither the Brownings nor Exxon used registered mail. It is also undisputed that Exxon did not report drilling costs to the Brownings within ninety days after completion of the well and that it did not respond to the demands sent by certified mail within fifteen days of its receipt.

Plaintiffs argue that they have complied with the statute and that Exxon, having failed to timely respond, has forfeited its right to collect drilling costs from them.

The court has found no reported Louisiana cases interpreting whether a party's use of certified mail is the substantial equivalent of registered mail as required by the Louisiana statutes [4]. Thus, this court becomes in effect another Louisiana state court and must chose the rule which it concludes the Louisiana Supreme Court would most likely adopt. *Balliache v. Fru–Con Construction Corp.,* 866 F.2d 798, 799 (5th Cir.1989).

The court finds that the plaintiffs' argument that Exxon forfeited its right to recoup drilling costs by failing to respond to its letter sent by certified mail lacks merit. Under the statutory scheme, it is clear that Exxon was entitled to notice sent by registered mail.

The applicable statute here specifically requires the use of registered mail. Article 9 of Louisiana's Civil Code provides:

"When a law is clear and unambiguous and its application does not lead to absurd

---

**4.** The plaintiffs' reliance on *Rivers v. Sun Oil,* 503 So.2d 1036, (La.App. 2d Cir.1987) is misplaced. The court in *Rivers* did impose the forfeiture provisions, but unlike the plaintiffs in this case, the parties in *Rivers* stipulated that the unleased owner complied with the requirements of La.R.S. 30:103.1 and 103.2 by properly demanding an itemized cost statement by registered mail.

consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature."

■ Section 103.2 is certainly clear and unambiguous regarding the requirement of registered mail. Ordinarily that should be the end of it. Plaintiffs, however, present an argument (although not in those precise words) that mandating registered, as opposed to certified, mail leads to absurd consequences. Plaintiffs suggest that the purpose of the law is to put the unit well operator on notice that he has only a limited time to furnish detailed drilling costs and, since it is undisputed that Exxon received the demand, the purpose of the law is served. As plaintiffs put it:

"The discrepancy between registered and certified mail, in this instance, should be without substance. Both registered and certified mail provides the sender the opportunity to verify the fact and time of receipt by the addressee. Registered mail simply further protects the **sender** and has absolutely no bearing on the addressee. Consequently, since both certified and registered mail give evidence of receipt of notice and accomplishes the intention of the statute, the fact that the correspondence between the parties was by certified rather than registered mail should be a distinction without (sic) difference." (Memorandum of plaintiffs, p. 13)

In support of that proposition, plaintiffs cite the case of *Sloane v. Davis*, 397 So.2d 1376 (La.App. 3d Cir.1981), a case involving a contract between two private parties. The contract provided that if one party desired to exercise an option to purchase royalty, notice of such was to be sent to the other party by registered mail. The court held:

"... The contract does not state a time limit within which Sloane was required to give notice. However, it is clear that the notice was given within a reasonable time. In our view, the mere failure of plaintiff to give notice by 'registered mail' is not sufficient to defeat the plaintiff's claim, where the notice was actually received by defendant." id. at 1382.

The court in *Sloane* was dealing with a private contractual provision regarding notice of the exercise of an option, not a penal statute providing forfeiture of significant amounts of money. Although the court stated no authority for its holding, it may well have reasoned that the intent of the notice provision was to insure communication to the other party that the option was exercised. The same court, considering not a private contract, but the very statute upon which plaintiffs in this case rely came to an entirely different conclusion. In *White v. Phillips Petroleum Co.*, 232 So.2d 83, (La.App. 3d Cir.), *writ refused*, 255 La. 907, 233 So.2d 560 (1970), the owners of unleased land addressed a demand upon the unit well operator by **registered mail**. The court held:

"This [LSA–R.S. 30:103.2] is a penal statute, requiring strict construction. The penalty is inapplicable because plaintiffs failed to comply with the express conditions therein set forth.

On February 3, 1967, plaintiff sent a registered letter to defendant reciting (1) that on August 18, 1960 they had requested defendant to advise what it was doing with the share of production enuring to the one acre in controversy, and (2) making demand that they be furnished within 10 days with an itemized statement of production from this acre. This does not meet the strict requirements of the statute.

The statute expressly requires the owner of an unleased interest to request the Operator to furnish a sworn, detailed itemized statement showing the costs of drilling operations on the land and penalizes the Operator only when it has failed to furnish such information within (1) 90 days from the completion of the well, and (2) fifteen additional calendar days from the date of receipt of written notice by registered mail from the owner of the unleased interest calling the Operator's attention to the fact that it has failed to comply with the provisions of that statute.

Plaintiffs inquired only about production. At no time did they request a statement of costs, and at no time did they write the Operator pointing out that it had failed to comply with the statute." id. at 90.

As noted above, the statute also expressly requires the owner of an unleased interest to use registered mail to request a sworn, detailed itemized statement of drilling costs. Surely Louisiana's highest court would require strict compliance with all statutory requirements before ordering such a forfeiture.

The words of the statute are "clear and unambiguous" to this court, see Article 9 Louisiana Civil Code, supra, however, further examination lends additional support for our conclusion.

There are similarities between certified and registered mail. Both employ the use of a sticker bearing an identification number on the envelope or package to be mailed. The number on the sticker is matched with the identifying number on the sender's certified mail or registered mail receipt to identify the document or package mailed. *Sylvan v. Commissioner*, 65 TC 548, 1975 WL 3165 (1975).

However, an envelope sent by registered mail is monitored from the point of acceptance by the United States Post Office until delivery to the addressee through the use of a system of numbered mailing labels affixed to the envelope mailed and registry receipts on which corresponding numbers are entered. *Haaland v. Commissioner*, 48 TCM (CCH) 378, 1984 WL 15038, (1984) citing **Domestic Mail Manual,** Issue 13, § 911.11 (Dec. 29, 1983) and **Registered Mail Handbook,** DM–901, Ch. 3–5 (April 1, 1983). Certified mail is not monitored as it moves through the Postal System. *Haaland v. Commissioner*, 48 TCM (CCH) 378, 1984 WL 15038, (1984) citing **Domestic Mail Manual,** Issue 13, 912.1 931.1, (Dec. 29, 1983). Registered mail is more expensive because the post office keeps a record of it, thereby facilitating the reconstruction of the exact course and the timetable of the missive. This difference between registered and certified mail may explain why the legislature would choose to require registered, rather than certified, mail in such a penal statute.

Assuming that LSA–R.S. 30:103.2 could be viewed as ambiguous, Article 13 of the Civil Code declares that, "Laws on the same subject matter must be interpreted in reference to each other."

In another section of Title 30, entitled "Minerals, Oil and Gas and Environmental Quality," the Louisiana Legislature has demonstrated that it is cognizant of the difference between registered and certified mail and is quite capable of employing either or both wherever, in its judgment, those terms are necessary to be specified. As discussed above, registered mail is required by LSA–R.S. 30:103.1 and 103.2. Yet, in LSA–R.S. 30:10, the legislature requires an owner who is drilling or intending to drill a unit well to notify all other owners in the unit of the intent by **"certified mail, return receipt requested."** Turning to another title of the Revised Statutes, LSA–R.S. 9:4802 requires the seller of movables to deliver notice to the owner by **"registered *or* certified mail, return receipt requested."** (emphasis added) Other examples abound in the statutes, all of which tend to show that if the legislature had intended the reports under LSA–R.S. 30:103.1 and 103.2 to be effected by certified mail, it would not have specified registered mail. Clearly the Louisiana Legislature does not equate "certified mail" to "registered mail" in Section 103.2. If it had intended to do so, it would have said so.

Thus, heeding the bidding of Article 9, this court makes no further interpretation. Since the demand upon Exxon was not by registered mail, no forfeiture has occurred.

**The Alternative Argument**

■ Alternatively, plaintiffs argue that Exxon is entitled to recover only one-half of the costs. Plaintiffs contend:

"... that it is the lessee's obligation under an oil, gas and mineral lease to bear the drilling costs incurred during the existence of such lease and that the costs for drilling operations which Exxon unilaterally withheld were incurred when Sabine, and therefore Exxon by virtue of the farmout agreement [5], bore the responsibility there-

---

**5.** The farmout agreement between Sabine and Exxon has nothing to do with this case. Under Louisiana law, such an agreement is simply a

contract subject to a suspensive condition. See *Chevron, U.S.A., Inc. v. Aguillard*, 496 F.Supp. 1031, 1033 (M.D.La.1980). All actions taken by

for. They contend that because Exxon was not able to utilize the Browning Lands in sufficient time to maintain the Browning Lease (through no fault of the Brownings [6]), Exxon cannot subsequently recover costs incurred and for which it was responsible during the existence of the lease."

(memorandum of authorities p. 7)

This entire argument is premised upon the incorrect notion that Exxon (Sabine) was "responsible during the lease" for drilling costs **upon the Browning land.** Exxon (Sabine) was, indeed, responsible for the drilling costs of the Strain well because Sabine was the lessee under a mineral lease covering the land where the well was drilled. The well was not drilled upon Browning land and Exxon (Sabine) exercised no rights under the Sabine lease upon the Browning property in the drilling of the well. The coincidence that Sabine was also the lessee under a separate lease covering the Browning tract is completely irrelevant. During the time that the well was being drilled, Exxon (Sabine) had no more responsibility for drilling costs attributable to the Browning tract than if the Browning lease had been with XYZ Oil Company, instead of Sabine.

The Strain well was not drilled upon the Browning lease. The Browning lease (no drilling operations ever having been conducted) expired. The expiration of the lease occurred before the formation of a production unit and designation of a unit well by the Louisiana Commissioner, as authorized by Louisiana law. At the time the unit was formed, the Commissioner determined that a portion of the Browning tract should be in-

cluded in the unit and allowed to receive its proportionate share of the proceeds of the "pool" of minerals which the well discovered. At that time the Browning tract was not under mineral lease. Consequently, Sabine could not transfer to Exxon its interests in the expired mineral lease upon the Browning tract.

Significantly, because the Browning lease had expired, the owners of the now unleased tract became entitled to receive the full value of the minerals attributable to that tract, instead of the one-eighth specified in the expired lease. The position taken by plaintiffs would require post-expiration enforcement of the expired lease as to the former lessee's responsibility for drilling costs but would treat as expired the former lessee's contractual right to keep seven-eighths of the minerals—A "HEADS—I WIN—TAILS—YOU LOSE" proposition if ever there was one.

The court is confident that Exxon (Sabine) would be willing to reinstitute the lease upon the Browning tract and assume responsibility for paying drilling/production costs attributable to that tract if the owners of that tract were willing to accept the one-eighth royalty specified in the lease.

An expired mineral lease is just that, an expired lease [7]. It is as though the Browning lease had never been written. The Louisiana statutes contain no exemption for "recently leased, but now unleased, lands." The Louisiana statutes apply to "unleased lands" and that is precisely what the Browning lands were at the time the Commissioner formed the production unit.[8]

---

Exxon in connection with the drilling of the well were under the authority of Sabine's lease of the land where the well was drilled. Those actions had no connection with Sabine's separate lease of the Browning tract.

**6.** Plaintiffs' reference to "fault" is misplaced here. The issue is responsibility for payment of drilling/production costs, whether by contract or by operation of law.

**7.** LSA–R.S. 31:133 provides: "A mineral lease terminates at the expiration of the agreed term or upon the occurrence of an express resolutory condition."

**8.** It is well established that "[O]perations on land burdened by a lease or land unitized therewith sufficient to maintain the lease according to its terms will continue it in force as to the entirety of the land burdened." LSA–R.S. 31:114

"Hence production from a well anywhere within a unit during the primary term of the lease maintains all leases included in whole or in part in the unit beyond the primary term." *Rougon v. Chevron, U.S.A., Inc.,* 575 F.Supp. 95 (1983) citing *Hunter v. Shell Oil Co.,* 211 La. 893, 31 So.2d 10 (1947).

However, in the present case the lease expired before the unit was formed. Thus when the well within the unit began producing, there was nothing to be maintained on the tract in question.

It was only the formation of the production unit by the Commissioner that allowed participation by the Browning tract. The well was not drilled on Browning land and the Browning tract had no relationship or connection with the property where the well was drilled until the Commissioner determined that the mineral "pool" from which extraction was to be made included 6.746 acres of the Browning property. Because of formation of the unit, minerals had then been "discovered" upon the Browning property and, because the Brownings had not conveyed their rights, they became the owners of all minerals discovered on their property. They are, therefore, entitled to receive all proceeds from production attributable to their lands. Under the Louisiana statutory scheme, they owe the correlative obligation of paying their share of the drilling/production costs. LSA–R.S. 30:10 A(2)(c); *General Gas Corp. v. Continental Oil Co.*, 230 So.2d 906 (La.App. 1st 1970).

For the foregoing reasons, the motion for summary judgment on behalf of plaintiffs is hereby DENIED and the motion for summary judgment on behalf of Exxon is hereby GRANTED. Judgment will be entered dismissing the claims of plaintiffs.