541 So.2d 332 (1989)
J.B. WILLIS and Terri Jones Willis, Plaintiffs-Appellants,
v.
INTERNATIONAL OIL AND GAS CORPORATION, et al., Defendant-Appellee.
No. 20409-CA.
Court of Appeal of Louisiana, Second Circuit.
March 29, 1989.
Joel M. Sermons, Shreveport, for plaintiffs-appellants.
*333 Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell by Thomas G. Smart, Lafayette, for defendant-appellee Intern. Oil & Gas Corp.
Hargrove, Guyton, Ramey & Barlow by Scott C. Sinclair and A.L. Wedgeworth, III, Shreveport, for defendant-appellee Marshall Exploration.
Before FRED W. JONES, Jr., LINDSAY and HIGHTOWER, JJ.
HIGHTOWER, Judge.
The plaintiffs, J.B. Willis and Terri Jones Willis (the Willises), appeal a May 1988 partial summary judgment which decided several claims concerning the mineral interests in certain immovable property in Caddo Parish.
With reference to the present issues, the facts are undisputed. The Willises own the surface and an undivided one-half interest in the minerals of an 80-acre tract of land. In December 1980, they leased their mineral interest to McCook Company (McCook). McCook, in turn, subleased the interest to International Oil & Gas Corporation (International) in November 1981. The other undivided one-half mineral interest in the tract had been retained by a previous landowner, and Marshall Exploration, Inc. (Marshall) acquired a lessee's rights in that interest.
In June 1982, a drilling and production unit, which included a portion of the subject tract, was established by the Louisiana Commissioner of Conservation as authorized by LSA-R.S. 30:9. In the unit order, Marshall was designated to be the operator of the unit well. Marshall then proceeded to drill, equip and operate the well. Neither plaintiffs nor International made any direct contribution to the expenses. The unit well turned out to be a marginal producer which has not yet paid for its cost, and may never do so.
International paid the Willises royalties only through February 1983. In September 1983 the Willises made demand on International for an accounting. When International failed to respond, the Willises filed the present suit for an accounting and for unpaid royalties, as well as for damages, attorney fees and costs. The Willises also asked that Marshall withhold and pay to them, the Willises, their share of the production under the lease. McCook was not made a party to the suit.
International subsequently filed an answer and a third party demand against Marshall. International also executed a release which was filed of record in Caddo Parish in January 1984. That release purported to relinquish to the Willises all rights, title, and interest in and to the lease executed by the Willises to McCook.
All parties then filed motions for summary judgment, and a partial summary judgment was granted. The Willises devolutively appealed; the other parties neither appealed nor answered the appeal.
The partial summary judgment, signed by the trial court on May 16, 1988, granted some relief to all three parties. First, there was judgment in favor of International against Marshall, requiring a detailed accounting regarding expenses and revenues of the unit well from commencement of drilling through January 1984. Marshall subsequently complied with this portion of the judgment. Second, judgment was granted in favor of Marshall against the Willises and International, declaring that Marshall was entitled to retain 100 percent of the proceeds from the production of the unit well until such time as Marshall recovered the full amount expended for drilling, completing and operating the well. Third, there was judgment in favor of the Willises against International, requiring an accounting of royalties due for the period from February 1983 through January 1984, and also awarding damages of double the amount of unpaid royalties on the unit well for that same period, together with legal interest and attorney fees. Finally, the court declared that International's release effectively terminated, as of January 31, 1984, all interests of International and McCook in their mineral lease, and that after that date the Willises were to have the status of unleased owners with respect to the unit well. Court costs were assessed to International.
*334 On appeal two issues are presented: (1) whether the plaintiffs' sublessee, while in default, could execute a valid release of the mineral lease, thereby avoiding the payment of future royalties; and (2) whether, pending recovery of the well costs, the operator could retain all proceeds from production. Finding the decision of the trial court concerning both issues to be correct, we affirm.

RELEASE OF THE LEASE
The instrument through which McCook conveyed its interest in the Willis lease to International is styled as an assignment. However, since McCook reserved an overriding royalty, the instrument was a sublease. Bond v. Midstates Oil Corp., 219 La. 415, 53 So.2d 149 (1951); Smith v. Sun Oil Co., 165 La. 907, 116 So. 379 (1928). See also the comments to LSA-R.S. 31:127.
Because McCook subleased its rights under the lease to International, a question exists with regard to whether the release executed by International served to release only International's rights, or the rights of both International and McCook. However, it is not necessary for us to answer that question here, nor would it be appropriate to adjudicate rights and/or obligations of McCook, who is not a party to this lawsuit. It is sufficient to note that Paragraph 4 of the Willis lease specifically provided for execution of a release at any time:
Lessee may at any time execute and deliver to Lessor ... a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered....
The McCook sublease, according to its language, transferred to International the "rights incident" to the lease. Moreover, a sublessee acquires the rights and powers of the lessee. LSA-R.S. 31:128.
Thus, as sublessee under the Willis lease, International had the right to execute a release which prospectively relieved at least International, if not McCook, of all obligations as to the acreage at issue. Nor was International's right to execute a release impliedly conditioned on its timely payment of royalties. Instead, the plain wording of the lease specifically created the right to execute a release at any time. Moreover, the Louisiana Mineral Code grants specific remedies to a mineral lessor for nonpayment of royalties. See LSA-R.S. 31:137-141. Indeed, the Willises have pursued a remedy under those pertinent articles, and have obtained a judgment for double the amount of royalties due. Upon satisfaction of that judgment, their remedy for nonpayment of royalties will be complete.

RETENTION OF THE PROCEEDS OF PRODUCTION FROM THE UNIT WELL
As previously mentioned, neither the Willises, nor International, made any direct contribution to the expense of drilling, equipping or operating the unit well. Under these circumstances, the trial court was correct in holding that Marshall was entitled to retain 100 percent of the proceeds from the production of the well until such time as the entire amount expended has been recovered.
LSA-R.S. 31:2, Article 2 of the Louisiana Mineral Code, states that the provisions of the Mineral Code are supplementary to the Louisiana Civil Code, and that in situations in which the Mineral Code does not expressly or impliedly provide for a particular situation, the Civil Code or other laws are applicable. In Martel v. Jennings-Haywood Oil Syndicate, 114 La. 351, 38 So. 253 (1905), relying on former Civil Code Art. 501, it was held that the plaintiffs, as owners of an interest in oil-bearing land, were entitled to a like interest in the oil produced, less all expenses of production. That article, at that time, provided that the fruits produced by a thing belonged to the owner though produced by the work and labor of a third person "on the owner reimbursing such person his expenses."
By Act No. 180 of 1979, Civil Code Art. 501 was revised and reenacted with other *335 articles into Articles 477 to 532. As part of that legislation, the Revision Comments to Art. 488[1] state in pertinent part:
According to Louisiana jurisprudence, persons engaging in ... mineral operations in good faith are bound to account to the owner of the land but they are entitled to reimbursement of their production costs.... [S]ee Huckabay v. Texas Co., 227 La. 191, 78 So.2d 829 (1955); Allies Oil Co. v. Ayers, 152 La. 19, 92 So. 720 (1922); Cooke v. Gulf Refining Co., 135 La. 609, 65 So. 758 (1914). Recovery of expenses in these circumstances is said to rest on the principle of unjust enrichment. See Scott v. Hunt Oil Co., 152 So.2d 599 (La.App. 2d Cir.1963).
The Louisiana Supreme Court stated in Huckabay, supra:

[O]n several occasions this Court has applied the equitable rule that where one co-owner (or co-lessee) has explored and developed a field without the concurrence or assistance of the other, the former is bound to account to that other for his proportionate share of the proceeds less a proportionate share of the expenses.... While the right of an owner to refrain from exercising his right of ownership, if so minded, is absolute, LSA-C.C. Arts. 491, 496, he nevertheless may not enjoy the profits without participating in the expenses incurred in producing those profits, since to permit him to do so would violate the moral maxim of the law that no one ought to enrich himself at the expense of another.
Id., 78 So.2d at 831 (citations omitted).
Thus, to the extent that the Willises are co-owners of the minerals at issue, and have not participated in the expenses incurred in producing those minerals, they are not entitled to a proportionate share of the proceeds without paying a proportionate share of the expenses. They should not be allowed to profit at the expense of those who took the financial risk of exploring for oil, and who currently are realizing no profits, but merely are applying the proceeds from production to offset their losses.
The fact that the acreage at issue is part of a drilling unit established by the Commissioner of Conservation does not change this result. Indeed, when the unit was established and the unit well drilled, the pertinent provisions of Subsection A of LSA-R.S. 30:10, as it then read, provided:
(1) Where the owners have not agreed to pool their interests, the commissioner shall require them to do so and to develop their lands as a drilling unit, if he finds it necessary to prevent waste or to avoid drilling unnecessary wells.
. . . .
(c) In the event pooling is required, the cost of development and operation of the pooled unit chargeable by the operator to the other interested owners shall be limited to the actual reasonable expenditures required for that purpose, including a charge for supervision. In the event of a dispute relative to these costs, the commissioner shall determine the proper costs, after notice to all interested persons, at a hearing.[2]
(Emphasis added).
Previous to LSA-R.S. 30:10, Act 157 of 1940 contained language very similar to that quoted above regarding the cost of development and operation of a pooled unit. In Hunter v. McHugh, 11 So.2d 495 (La. 1942), the plaintiff argued that, although Act 157 made provision for the plaintiff to be reimbursed the proportionate share of the cost of drilling and operating the well chargeable to the other landowners or leaseholders in the drilling unit, there was no provision made for collecting or enforcing the reimbursement. The Supreme Court answered this contention by stating *336 that the plaintiff had and would have possession of all the proceeds from the production of the well, and could retain all the proceeds until the cost of drilling the well and putting it on production was entirely paid for.
In summary, whether one is a co-owner who has not concurred or assisted in the exploration and development of the property, or is the owner of a separately owned tract of land embraced within a drilling unit and has elected not to participate in the risk and expense of the unit well, there is no entitlement to share in the proceeds from production until the cost of drilling and operating the well is paid for. That rationale clearly applies in the instant case to the Willises, who are co-owners of the mineral interest as to a tract of land embraced within the drilling unit.
Rejecting appellants' arguments to the contrary, we also hold that the doctrine of correlative rights[3]the "Good Neighbor Policy," as referred to by appellantsdoes not authorize the court to create a contract between the Willises and Marshall. Inasmuch as Marshall did not lease from the Willises, it has no contractual relationship with them, nor is it under a duty to now enter into a lease with them.
For the foregoing reasons, we affirm the judgment of the trial court insofar as that judgment declared International's release effectively terminated all interest of International in the Willis lease, and insofar as that judgment declared Marshall was entitled to retain 100 percent of the proceeds from the production of the unit well until such time as the expenses of drilling, completing and operating the unit well are recovered. Costs of appeal are assessed to the appellants.
AFFIRMED.
NOTES
[1] LSA-C.C. Art. 488 provides:

Products derived from a thing as a result of diminution of its substance belong to the owner of that thing. Where they are reclaimed by the owner, a possessor in good faith has the right to reimbursement of his expenses. A possessor in bad faith does not have this right.
[2] Subpart A(1)(c) was repealed by Act. No. 345 of 1984, which enacted parts (2) and (3) to Subsection A.
[3] See LSA-R.S. 31:10 and Comment.