IzWHIPPLE, Judge.
This case is before us on appeal from a judgment of the trial court which dismissed, with prejudice, plaintiffs’ claims against TXP Operating Company (“TXP”) for a declaration that TXP was liable for well costs incurred prior to the release by TXP of mineral leases affecting plaintiffs’ land and for a monetary judgment for the amount of well costs paid by plaintiffs out of unit production. For the following reasons, we affirm.
BACKGROUND FACTS
The facts of this case are not in dispute. Plaintiffs, Myrtie J. Shanks, James R. Peabody, F.S. Ambrose and Haney E. Ambrose, Jr., (or their predecessors-in-title) granted four oil, gas and mineral leases (“the leases”) covering property owned by them in East *474 Baton Rouge Parish to defendant, C.T. Car-den, in April of 1976. All of the leases provided for a primary term of ten years, annual delay rentals of $5.00 per acre and a one-eighth royalty on oil and gas production.
In May of 1976, Carden assigned a one-half interest in three of the four leases to Exchange Oil & Gas Corporation (“Exchange”), and in September of 1976, Carden assigned a one-half interest in the remaining lease to Exchange. Thereafter, on September 30, 1985, TXP acquired all of Exchange’s interests in |3the leases and assumed all of the liabilities of Exchange with respect to the leases. Only TXP’s one-half interest in the leases is involved in this appeal.[1]
On July 12, 1980, Exxon began drilling a well, the Exxon-Tommy J. Strain No. 1 Well, on a tract of land which was not covered by any of the leases and which was not owned by plaintiffs. Exchange did not participate in or consent to Exxon’s operations in drilling the well. The well reached total depth on February 2, 1981, was tested and was then shut-in on May 27, 1981. The total well costs incurred amounted to $16,621,634.66.
On February 12, 1981, after the well was completed, Exxon filed an application with the Commissioner of Conservation, requesting a hearing for the purpose of establishing a unit for the well, pursuant to LSA-R.S. 30:9. Exchange did not initiate the unitization proceedings, did not present any counter-proposals or evidence regarding the proposed unitization, and did not participate in the unitization proceedings in any manner, although an Exchange representative did attend the hearing.
Thereafter, the Commissioner issued Order No. 1124, effective April 20, 1981, creating the 18,000 TUSC RA SUA Unit for production of gas and condensate from the 18,000’ Tuscaloosa Sand, Reservoir A. The unit included all or portions of each of the tracts covered by the leases, as well as property belonging to others. The Exxon-Tommy J. Strain No. 1 Well was designated as the unit well, and Exxon was designated unit operator.
The well remained shut-in awaiting marketing arrangements until July, 1985, when production of gas and condensate from the well commenced. Until |4that time, the leases had been maintained in effect by rentals and shut-in payments. Once production began, Exxon, on behalf of all lessees and their successors, paid full royalties to plaintiffs on all production of oil, gas and minerals attributable to their respective tracts within the unit. Well costs were not charged to plaintiffs; rather, Exxon, as unit operator, withheld from Exchange the monthly proceeds of unit production attributable to Exchange’s leasehold interests in order to recover well costs Exxon had previously incurred.
Approximately six months after production began, Exchange apparently made a prediction that the well would never “pay out,” that is, the value of production from the unit would never be sufficient to repay Exxon for all unit well costs. Thus, by instrument dated January 13,1986, Exchange released all of its right, title and interest in and to the leases.
Upon Exchange’s release of its leasehold interests, plaintiffs became unleased land owners of a one-half interest in their respective tracts. Following the release by Exchange, Exxon continued to withhold the proceeds of production to recover the remaining unpaid well costs in the amount of $14,066,-590.30. The amount of well costs attributable to plaintiffs’ tracts was $303,509.77. These well costs, withheld from plaintiffs’ share of the proceeds of production following the release of the leases by Exchange, are the subject of this appeal.
As of October 21, 1989, the well paid out, and from the time of pay-out through June, 1994, plaintiffs, as unleased land owners of a one-half interest in their tracts within the unit, had received $426,657.92 as proceeds from production less operating costs.
*475 PROCEDURAL HISTORY
On May 14, 1992, plaintiffs filed suit against Exxon, TXP, as successor to Exchange’s interests in the leases, C.T. Carden and his wife, Edna Mae Assel 15Carden, seeking a declaratory judgment, declaring that Exxon, TXP and the Cardens were liable, in solido, for well costs incurred prior to the date Exchange released its interests in the leases, and a monetary judgment in their favor for the amount of each plaintiffs share of unit production withheld by Exxon after the release of the leases for recoupment of well costs.[2]
TXP filed a reconventional demand against plaintiffs, averring that, in the event plaintiffs were afforded relief imposing upon TXP the obligation to pay the remaining well costs, then TXP was entitled to its share of mineral production or the proceeds therefrom, subject only to the payment of royalties to plaintiffs under the previously existing leases. Thus, TXP sought a judgment declaring its Release of Oil, Gas and Mineral Leases void and of no effect, in the event relief was granted to plaintiffs. TXP further sought judgment against plaintiffs, in the event plaintiffs were granted relief, under the theory of unjust enrichment, requiring plaintiffs to reimburse TXP the full amount of any well costs TXP was required to pay.[3]
Because the principal defendant in this matter was TXP, all of the parties agreed to sever their claims against Exxon and the Cardens, both as to the original claim and the incidental claims. Prior to trial, plaintiffs and TXP entered into a Stipulation of Facts and Authenticity, and the matter was submitted on the stipulation and oral arguments by the parties. By judgment dated September 19, 1994, the trial court rendered judgment in favor of TXP, dismissing plaintiffs’ claims against it with prejudice. TXP’s reconven-tional demand was dismissed as moot.
|6From this judgment, plaintiffs appeal, averring that the trial court erred in holding:
(1)that an oil and gas lessee who releases the lease is thereby relieved of responsibility to the lessor for well costs previously accrued;
(2) that plaintiffs-lessors, who were forced to pay the unit operator previously-incurred well costs out of unit production accruing to lessors after the lessee released its leasehold interest in the producing well, could not recover the amount of such paymént from the former lessees;
(3) that failure to relieve the lessee of responsibility for well costs chargeable while the leases were in effect would be an unjust enrichment of the lessors who paid such costs out of production after the leases terminated, on the ground that after four years of paying well costs out of production, the well became profitable; and
(4) that justice was done in relieving the lessee of its contractual obligation because the former landowners-lessors ultimately profited from the lessee’s abandonment of the leases when production from the unit well exceeded the lessee’s expectations.
TXP answered the appeal, averring that, in the event this court reverses the trial court’s judgment which dismissed plaintiffs’ claims against it, this court should also reverse the dismissal of TXP’s reconventional demand.
DISCUSSION
Plaintiffs assert on appeal that the mineral leases granted to Exchange provided for the payment of royalties to plaintiffs “free of expense.” Thus, they argue that the trial court erred in dismissing their claims against TXP, because the unit well costs they seek to recover from TXP are costs that had accrued while |7the leases were in effect and that were, consequently, the liability of TXP, as the successor of Exchange’s interests in the leases.
TXP, on the other hand, acknowledges that it was responsible for any expenses incurred during the existence of the leases. However, TXP argues that the release of the leases prospectively relieved it of all lease obligations that had not yet accrued. TXP con *476 tends that the well costs at issue are not its responsibility, because they did not accrue during the existence of the leases.
Thus, the primary issue herein is when liability for well costs, incurred for a well drilled on someone else’s property prior to unitization, becomes chargeable to an owner (or lessee) who did not consent to unitization or to the drilling activities of the operating owner.[4]
The leases granted by plaintiffs provided the lessee with “the exclusive right to enter upon and use the land hereinafter described for the exploration for, and production of oil, gas, sulfur and all other minerals” in exchange for a mineral royalty of one-eighth of production attributable to the leases tracts. Pursuant to law, a royalty is a right to share in gross production “free of mining or drilling and production costs,” unless expressly qualified by the parties. LSA-R.S. 31:80. Moreover, the leases granted by plaintiffs specifically provide that oil royalties are to be “delivered to Lessor free of expense.” Thus, TXP, as lessee, was required to bear all costs and expenses relating to exploration, drilling and production operations relative to the leased land chargeable during the effective period of the leases.
lain brief, plaintiffs argue that TXP is liable to plaintiffs for the well costs they were forced to pay out of production following termination of the leases based solely on the lease contracts themselves and that unitization had no effect on TXP’s liability for these costs. However, it is clear that unitization did affect TXP’s liability herein. Contrary to plaintiffs’ arguments, TXP’s liability for well costs attributable to a well drilled on someone else’s land, which TXP did not lease, was not necessarily created by virtue of the leases. Rather, the unitization order, including the leased tracts at issue or portions thereof in the compulsory unit, affected TXP’s obligation for well costs, as an “owner” of a tract included within the unit.
The statutory law in effect on April 20, 1981, the effective date of the compulsory unitization order, provided that when the Commissioner of Conservation requires owners of separate tracts to pool their interests and develop their lands as a drilling unit, the cost of development and operation of the pooled unit “chargeable by the operator to the other interested owners” shall be limited to the actual reasonable expenditures required for that purpose, including a charge for supervision. LSA-R.S. 30:10(A)(1)(c) (prior to amendment by Acts 1984, No. 345, § 1).[5] However, the law did not specify when and how such costs were or were not “chargeable” to non-operating owners. Davis Oil Company v. Steamboat Petroleum Corporation, 583 So.2d 1139, 1142 (La.1991).
In Davis, the Supreme Court was faced with the issue of whether the operator of a forced drilling unit who initiated the unitization process could hold an adjacent lessee personally liable for well costs, where the lessee had not consented to operations by an operating owner within the compulsory unit. In | (^concluding that the operator could not hold the lessee personally liable for his proportionate share of well costs, the Supreme Court held that a non-operating owner or lessee, who does not consent to operations within a compulsory drilling unit by a unit operator, has no liability for the costs of development and operations, except out of his share of production. Davis Oil Company, 583 So.2d at 1143. Thus, where there is no production, the non-consenting, non-operating owner is not liable for any such costs. Davis Oil Company, 583 So.2d at 1143. Thus, it is clear that liability of a non-consenting, non-operating owner for well costs only arises as there is production.
*477 While the factual situation in Davis differed from the facts herein, we believe that the pronouncements therein are nonetheless controlling. Applying the dictates of Davis, we conclude that liability for well costs does not necessarily accrue at the time the costs are incurred.[6] Moreover, even the inclusion of the leased lands at issue within the compulsory unit did not, of itself, render TXP hable for well costs. Pursuant to Davis, TXP had no liability for well costs, but was only liable for such costs out of production. TXP’s liability for well costs accrued only as there was production from the unit well and only to the extent of its proportionate share of production. TXP’s, or Exchange’s, entire proportionate share of production was applied to the payment of well costs during the existence of the leases. Thus, we conclude that TXP paid all well costs for which it was hable by law.
lioWe further note that the Second Circuit Court of Appeal in Willis v. International Oil and Gas Corporation, 541 So.2d 332 (La.App. 2nd Cir.1989), was presented with a factual scenario similar to the facts presented herein. In Willis, the plaintiffs leased then-mineral interest in a tract of land to McCook Company, who in turn subleased the interest to International Oil & Gas Corporation (International). Subsequently, a drilling and production unit was established, which included a portion of the subject tract. The unit operator proceeded to drill and equip a well, and neither plaintiffs nor International made any direct contributions to the expenses. Once the well began producing, International paid plaintiffs royalties for a short period of time, but failed to continue paying royalties. Willis, 541 So.2d at 333.
The plaintiffs filed suit against International, seeking recovery of the unpaid royalties, and International filed a third party demand against the unit operator. Thereafter, International executed a release, rehnquishing to plaintiffs all rights, title and interest in and to the lease. On motions for summary judgment, the trial court rendered judgment, de-daring that after the date of International’s release of all of its interests in the lease, plaintiffs had the status of unleased owners with respect to the unit well and that the unit operator was entitled to retain the proceeds from production until it recovered well costs it had expended. Willis, 541 So.2d at 333.
The plaintiffs appealed, challenging the unit operator’s right to retain all proceeds from production, pending recovery of all well costs. The Second Circuit concluded that execution of the release prospectively relieved International of all obligations as to the acreage at issue and that the unit operator could continue to withhold from plaintiffs proceeds from production until such time as the entire luamount of well costs expended had been recovered. Willis, 541 So.2d at 334-335.
Therefore, inasmuch as TXP has paid all well costs for which it was liable by operation of law, if plaintiffs are entitled to reimbursement from TXP for their share of drilling costs paid out of production after TXP (or Exchange) relinquished its rights under the lease, it can only be by virtue of some independent agreement between the parties. Because the only agreements between the parties herein are the leases, we must examine the leases to determine if they imposed a duty upon TXP to pay the entire proportionate share of well costs attributable to the tracts at issue.
As stated above, pursuant to the leases, TXP was obligated to pay plaintiffs a mineral royalty on production “free of expense.” The parties have stipulated that from the time the well began producing until termination of the leases, TXP paid to plaintiffs royalties “without the deduction of any Well Costs or Operating Costs.” Plaintiffs, therefore, received royalties in the amounts set forth in the leases and “free of expense” as required by the leases, during the existence of and prior to termination of the leases.
*478 Paragraph three of the leases provided the lessee with the right to unilaterally execute a release of the leases at any time:
3. Lessee, may, at any time prior to or after the discovery and production of minerals on the land, execute and deliver to Lessor or file for record a release or releases of any portion or portions of the lands or any stratum or strata and be relieved of all requirements hereof as to the land, stratum or strata so released.... (Emphasis added).
Execution of the release pursuant to this provision prospectively relieved the lessee of all obligations as to the land released. See Willis, 541 So.2d at 334. Thus, after January 13, 1986, the date Exchange released all of its right, title and | ^interest in and to the leases, Exchange and TXP were relieved of any future obligations under the leases. Inasmuch as liability for the remaining unpaid well costs attributable to the tracts of land covered by the leases was a future obligation, i.e., a liability only incurred as the unit well produced and only to the extent of the proportionate share of production, TXP was relieved of this future obligation by the release executed in accordance with the provisions of the leases.
We, therefore, conclude that the leases granted by plaintiffs imposed no greater obligation for payment of well costs upon TXP. Pursuant to the leases, TXP was obligated to pay costs during the term of the leases and to pay plaintiffs royalties, free of these costs. Because Exchange did not consent to unitization or to the drilling activities of the operating owner, the costs arising during the existence of the leases chargeable to Exchange, and TXP by virtue of its acquisition of Exchange’s interests in the leases, were only those paid by TXP in the form of one hundred percent of its proportionate share of production prior to termination of the leases. TXP has paid all well costs for which it was liable.
Upon termination of the leases, plaintiffs, as unleased owners of a one-half interest in the tracts at issue, became entitled to receive the full value of the minerals attributable to the one-half interests in those tracts, instead of the one-eighth specified in the leases. Plaintiffs likewise became responsible for the payment of costs attributable to their interests.
Because we find no error in the trial court’s dismissal of plaintiffs’ claims against TXP, we pretermit discussion of TXP’s answer to the appeal which sought relief in the event we reversed the trial court judgment on the main demand.
CONCLUSION
For the above and foregoing reasons, the judgment of the trial court dismissing plaintiffs’ claims against TXP Operating Company and TXP Operating 113Company’s reeonven-tional demand against plaintiffs is affirmed. Costs of this appeal are assessed against plaintiffs.
AFFIRMED.

. The remaining one-half interests in the leases were assigned by Carden to Dalco Oil Company on May 13 and August 19, 1976. These one-half interests in the leases eventually passed to Exxon Corporation as sublessee. By Exchange Agreement dated April 12, 1991, Exxon assigned an undivided twenty-five percent working interest in the leases, insofar as the leases covered acreage within the production unit at issue, to Pacific Enterprises Corporation.

. Plaintiffs also sought other relief against Exxon, which is not a subject of this appeal.

. Other incidental demands were filed in this proceeding. However, they also are not the subject of this appeal.

. The Conservation Statute defines "owner” as "the person who has the right to drill into and to produce from a pool and to appropriate the production either for himself or for others.” LSA-R.S. 30:3(8). Exchange and TXP had the right to drill on plaintiffs' tracts under the leases; thus, TXP was an "owner” for purposes of the Conservation Statute during the existence of the leases.

. LSA-R.S. 30:10 was amended by Acts 1984, No. 345. However, because the 1984 amendment to LSA-R.S. 30:10 did not become effective until after the effective date of the Commissioner’s unitization order issued herein, it is not applicable to this case. See Davis Oil Company v. Steamboat Petroleum Corporation, 583 So.2d 1139, 1142 n. 1 (La.1991).

. This principle becomes clearer when considering the fact that although the well costs at issue were incurred during the existence of the leases, they were incurred for a well drilled on land not subject to the leases herein, and before issuance of the unitization order which included the leased lands in the compulsory unit. Thus, TXP had no liability whatsoever for well costs at the time they were incurred either by virtue of law or the leases.