984 So.2d 53 (2007)
Myrtie J. SHANKS, James R. Peabody, F.S. Ambrose and Haney E. Ambrose, Jr.
v.
EXXON CORPORATION, TXP Operating Company and C.T. Carden.
No. 2007 CA 0852.
Court of Appeal of Louisiana, First Circuit.
December 21, 2007.
Rehearing Denied May 2, 2008.
Rudolph Estess, Jr., Jack C. Caldwell Baton Rouge, LA, and Barbara B. Parsons, *54 Zachary, LA, for plaintiffs/Appellants, Ethel Shanks Haik, Administratix of the Succession of Myrtie Shanks, James R. Peabody, Michael St. Claire Ambrose, April Dawn Ambrose, Kenneth Scott Ambrose, and Haney E. Ambrose, Jr.
Jude C. Bursavich, Linton Morgan, Baton Rouge, LA, for Defendants/Appellees, J. Cuccia, Administrator of the Succession of C.T. Carden and Edna Mae Carden.
Before WHIPPLE, GUIDRY and HUGHES, JJ.
WHIPPLE, J.
This case is before us on appeal from a judgment of the trial court which dismissed, with prejudice, plaintiffs' claims for declaratory judgment and monetary relief against the Estate of C.T. Carden and Edna Mae Carden. In the suit, plaintiffs sought a judicial declaration that Carden was liable for well costs incurred prior to the release of mineral leases affecting plaintiffs' land and for the amount of well costs paid by plaintiffs out of unit production. For the following reasons, we affirm.

BACKGROUND FACTS
The facts of this case are not in dispute. Plaintiffs, Myrtie J. Shanks, James R. Peabody, F.S. Ambrose and Haney E. Ambrose, Jr., (or their predecessors-in-title) granted four oil, gas, and mineral leases ("the leases") covering property owned by them in East Baton Rouge Parish to C.T. Carden in April of 1976. All of the leases provided for a primary term of ten years, annual delay rentals of $5.00 per acre and a one-eighth royalty on oil and gas production.
In May of 1976, Carden conveyed a one-half interest in three of the four leases to Exchange Oil & Gas Corporation ("Exchange"), and in September of 1976, Carden conveyed a one-half interest in the remaining lease to Exchange. See Shanks v. Exxon Corporation, 95-2164 (La.App. 1st Cir.5/10/96), 674 So.2d 473, 474, writ denied. 96-1475 (La.9/20/96), 679 So.2d 436. Thereafter, on September 30, 1985, TXP acquired all of Exchange's interests in the leases and assumed all of the liabilities of Exchange with respect to the leases. Only this one-half interest in the leases is involved in this appeal.[1]
On July 12, 1980, Exxon began drilling a well, the Exxon-Tommy J. Strain No. 1 Well, on a tract of land that was not covered by any of the leases and was not owned by plaintiffs. Exchange did not participate in or consent to Exxon's operations in drilling the well. The well reached total depth on February 2, 1981, was tested, and was then shut-in on May 27, 1981. The total well costs incurred amounted to $16,621, 634.66.
On February 12, 1981, after the well was completed, Exxon filed an application with the Commissioner of Conservation requesting a hearing for the purpose of establishing a unit for the well, pursuant to LSA-R.S. 30:9. Exchange did not initiate the unitization proceedings, did not present any counter-proposals or evidence regarding the proposed unitization, and did not participate in the unitization proceedings in any manner. However, an Exchange representative did attend the hearing.
Thereafter, the Commissioner issued Order No. 1124, effective April 20, 1981, creating the 18,000 TUSC RA SUA Unit for production of gas and condensate from the 18,000' Tuscaloosa Sand, Reservoir A. *55 The unit included all or portions of each of the tracts covered by the leases, as well as property belonging to others. The Exxon-Tommy J. Strain No. 1 Well was designated as the unit well, and Exxon was designated as the unit operator.
The well remained shut-in awaiting marketing arrangements until July 1985, when production of gas and condensate from the well commenced. Until that time, the leases had been maintained in effect by rentals and shut-in payments. Once production began, Exxon, on behalf of all of the lessees and their successors, paid full royalties to plaintiffs on all production of oil, gas, and minerals attributable to their respective tracts within the unit. Well costs were not charged to plaintiffs; rather, Exxon, as unit operator, withheld from Exchange the monthly proceeds of unit production attributable to Exchange's leasehold interests in order to recover well costs Exxon had previously incurred.
Approximately six months after production began, Exchange apparently made a prediction that the well would never "pay out," i.e., that the value of production from the unit would never be sufficient to repay Exxon for all unit well costs. Thus, by an instrument dated January 13, 1986, Exchange released all of its right, title, and interest in and to the leases.
As this court has previously held in prior litigation in this matter, and as plaintiffs have acknowledged in their brief to this court, upon Exchange's release of the leasehold interests, plaintiffs became unleased land owners of a one-half interest in their respective tracts. See Shanks, 674 So.2d at 474, 478. Following the release by Exchange, Exxon continued to withhold the proceeds of production to recover the remaining unpaid well costs in the amount of $14,066,590.30. The amount of well costs attributable to plaintiffs' tracts was $303,509.77. These well costs, withheld from plaintiffs' share of the proceeds of production following the release of the leases, are the subject of this appeal.
As of October 21, 1989, the well paid out. Thus, from that time, plaintiffs, as unleased land owners of a one-half interest in their tracts within the unit, began receiving as proceeds eight-eighths of production attributable to their interests less operating costs.

PROCEDURAL HISTORY
On May 14, 1992, plaintiffs filed a suit for declaratory judgment and monetary relief against Exxon; TXP, as successor to Exchange's interests in the leases; C.T. Carden; and his wife, Edna Mae Assel Carden, seeking a judicial declaration that Exxon, TXP and the Cardens were liable, in solido, for well costs incurred prior to the date Exchange released its interests in the leases, and that plaintiffs were entitled to a monetary judgment in their favor for the amount of each plaintiff's share of unit production withheld by Exxon after the release of the leases for recoupment of well costs.[2]
Because the principal defendant in this matter was TXP, all of the parties agreed to sever their claims against Exxon and the Cardens, both as to the original claim and the incidental claims. Prior to trial, plaintiffs and defendants entered into a Stipulation of Facts and Authenticity, and the matter was submitted on the stipulation and oral arguments by the parties. By judgment dated September 19, 1994, the trial court rendered judgment in favor of TXP, dismissing plaintiffs' claims against it with prejudice.
From that judgment, plaintiffs appealed. On appeal, this court determined that because *56 Exchange had not consented to unitization or to the drilling activities of the operating owner, Exchange's (and, thus, TXP's) liability for well costs accrued only as there was production from the unit well and only to the extent of its proportionate share of production. Shanks, 674 So.2d at 477. This court further determined that Exchange's release of the leases prospectively relieved the lessee of all obligations as to the land leased. Thus, this court concluded, because TXP had paid all well costs chargeable to TXP during the existence of the leases, in the form of one hundred percent of production attributable to its lease interests, it had paid all well costs for which it was liable. Accordingly, the judgment of the trial court was affirmed. Shanks, 674 So.2d at 478.
As noted by this court in Shanks, upon termination of the leases, plaintiffs, as unleased owners of a one-half interest in the tracts at issue, became entitled to receive the full value of the minerals attributable to the one-half interests in those tracts, instead of the one-eighth royalty specified in the leases. Plaintiffs likewise became responsible for the payment of future costs attributable to their interests following the date of release of the leases. Shanks, 674 So.2d at 478. The Louisiana Supreme Court subsequently denied plaintiffs' writ application. Shanks v. Exxon Corporation, 96-1475 (La.9/20/96), 679 So.2d 436.
Thereafter, plaintiffs, Mrs. Carden, and the Estate of C.T. Carden filed cross motions for summary judgment on the issue of the Gardens' liability for the remaining well costs not paid during the existence of the leases.[3] Following a hearing on the motions, the trial court determined that, for the same reasoning set forth by the trial court in its dismissal of TXP and by this court in Shanks, the Cardens were entitled to summary judgment dismissing plaintiffs' claims against the Estate of C.T. Carden and Mrs. Carden with prejudice.[4]
Plaintiffs then filed the instant appeal, contending that the trial court erred in: (1) holding that "the issues presented are the same" in this case against mineral lessee Carden as in the case of sublessee TXP in the earlier trial as reported in Shanks; (2) finding that "this situation has already been dealt with by this court and by the 1st Circuit" and failing to recognize the distinction between the personal, contractual liability of the mineral lessee, Carden, to plaintiff-lessors for payment of well drilling costs and the limited, in rem liability of sublessee TXP, as decided in Shanks on the basis of oil and gas unitization law; and (3) failing to recognize and apply the provisions of the Mineral Code in that the lessee-sublessor Carden "is not relieved of his obligations or liabilities under a mineral lease unless the lessor has discharged him expressly and in writing," LSA-R.S. 31:129, as distinguished from a sublessee who assumed only an in rem interest in the lease and whose responsibility to the lessor is limited "to the extent of the interest acquired," LSA-R.S. 31:128.

SUMMARY JUDGMENT
A motion for summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions *57 on file, together with affidavits, if any, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B).
Pursuant to LSA-C.C.P. art. 966(C)(2), if the moving party will not bear the burden of proof on the issue at trial and points out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense, then the non-moving party must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the opponent of the motion fails to do so, there is no genuine issue of material fact and summary judgment will be granted. Keller v. Case, 99-0424 (La.App. 1st Cir.3/31/00), 757 So.2d 920, 922, writ denied, XXXX-XXXX (La.9/29/00), 770 So.2d 354. Moreover, as consistently noted in LSA-C.C.P. art. 967, the opposing party cannot rest on the mere allegations or denials of his pleadings, but must present evidence which will establish that material facts are still at issue. Hunter v. Tensas Nursing Home, 32,217 (La.App. 2nd Cir.10/27/99), 743 So.2d 839, 841, writ denied, 99-3334 (La.2/4/00), 754 So.2d 228.
In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to this case. Keller, 757 So.2d at 922.

DISCUSSION
On appeal, plaintiffs contend that the "heart" of their position is that Carden, as the original lessee, is personally liable to plaintiffs under the laws of contract and the Mineral Code for prior drilling, production, and operating costs incurred during the terms of the leases. They further contend that the liability of sub-lessee TXP previously adjudicated in Shanks is "of an entirely different nature" than Carden's liability under the leases.[5] According to plaintiffs, the well costs at issue were incurred at the time the well was drilled, which was also at a time when Carden was personally liable under the leases to protect plaintiffs against such costs. Plaintiffs assert on appeal that the mineral leases granted to Carden provided that he would bear all costs and expenses for exploration, drilling, and production chargeable during the effective period of the leases. Thus, they argue that the trial court erred in granting the Cardens' motion for summary judgment and dismissing plaintiffs' claims against the Cardens, because the unit well costs plaintiffs seek to recover from the Cardens are costs that had accrued while the leases were in effect and, thus, were costs for which Carden "personally guaranteed" payment.
Plaintiffs further contend that although Carden assigned his interests in the leases to Exchange (the predecessor-in-title to TXP), this assignment did not relieve him of his personal obligations under the leases. See LSA-R.S. 31:128. They further contend that Exchange's release of the *58 leases in 1986 did not discharge Carden's personal liability owed to plaintiffs because LSA-R.S. 31:129 provides that an assignor (Carden herein) is not relieved of his obligations under a mineral lease unless the lessor (plaintiffs herein) has discharged him expressly and in writing. Thus, plaintiffs assert, Carden remained liable for the full amount of unit well costs ultimately charged to the tracts that had been under lease to Carden.
Because the mineral lease is the law between the parties, Caskey v. Kelly Oil Company, 98-1193 (La.6/29/99), 737 So.2d 1257, 1262, we begin our analysis by considering the language of the leases at issue. With regard to the payment of royalties to plaintiffs and Carden's obligation for the payment of costs, the leases provide that "royalties shall be delivered to Lessor free of expense." As noted in Shanks, plaintiffs herein have stipulated that from the time the well began producing until termination of the leases, plaintiffs were paid royalties without being charged for any well costs. Shanks, 674 So.2d at 477. Nonetheless, plaintiffs contend that Carden obligated himself beyond the payment of those costs and, in fact, personally obligated himself to pay all well costs incurred, because they were incurred during the existence of the leases, albeit by a third party (Exxon) on someone else's land not subject to the leases herein and prior to unitization. According to plaintiffs, Carden's obligation for all well costs arose the day the leases were granted and was still in effect when all costs became chargeable, i.e., the date the unitization became effective.
Thus, as was the case in Shanks, the primary issue now before us is when liability for well costs, incurred for a well drilled on someone else's property prior to unitization, becomes chargeable to an owner (or lessee) who did not consent to unitization or to the drilling activities of the operating owner.[6]
As this court noted in Shanks, the leases granted by plaintiffs provided the lessee with "the exclusive right to enter upon and use the land hereinafter described for the exploration for, and production of oil, gas, sulfur and all other minerals" in exchange for a mineral royalty of one-eighth of production attributable to the leased tracts. Shanks, 674 So.2d at 476. Pursuant to law, a royalty is a right to share in gross production "free of mining or drilling and production costs," unless expressly qualified by the parties. LSA-R.S. 31:80. Moreover, as stated above, the leases granted by plaintiffs specifically provide that oil royalties are to be "delivered to Lessor free of expense." Thus, Carden, as original lessee, remained liable for all costs and expenses relating to exploration, drilling, and production operations relative to the leased land chargeable during the effective period of the leases. See LSA-R.S. 31:129.[7]
*59 However, contrary to plaintiffs' arguments herein, the mere fact that the leased tracts were included in a compulsory drilling unit during the existence of the leases did not render Carden liable for well costs for a well Indrilled on someone else's land, which Carden did not lease. Clearly, the unitization order, which included the leased tracts at issue or portions thereof in the compulsory unit, did affect Carden's obligation for well costs, as an "owner" of a tract included within the unit. However, as this court noted in Shanks, a non-operating owner or lessee, who does not consent to operations within a compulsory drilling unit by a unit operator, has no liability for the costs of development and operations, except out of his share of production.[8]Shanks, 674 So.2d at 476, citing Davis Oil Company v. Steamboat Petroleum Corporation, 583 So.2d 1139, 1143 (La.1991). Thus, the liability of a non-consenting, non-operating owner for well costs only arises or accrues as there is production. Shanks, 674 So.2d at 476.
As this court further concluded in Shanks, the lessee's liability for well costs does not necessarily accrue at the time the costs are incurred.[9] Moreover, even the inclusion of the leased lands at issue within the compulsory unit did not, of itself, render Carden liable for all well costs under the leases or by operation of law. Pursuant to Davis and Shanks, Carden had no liability for well costs, except for such costs that could be recouped out of production, given the complete lack of evidence or even the suggestion that Carden in any way consented to unitization or to the drilling activities of the operating owner. Thus, Carden's liability for well costs accrued only as there was production from the unit well and only to the extent of the proportionate share of production for the leased tracts at issue. Davis, 583 So.2d at 1143-1144; Shanks, 674 So.2d at 477.
Moreover, pursuant to the leases, Carden's obligation to plaintiffs was fulfilled upon the payment to them of royalties "free of expense." Accordingly, the payment of all costs for these tracts of land as those costs accrued or became due, i.e., to the extent of the share of production attributable *60 to these tracts, fulfilled the obligation under the leases to pay royalties "free of expense." We find no language in the leases to support plaintiffs' assertion that Carden agreed to any greater liability for well costs under the facts herein, other than: (1) to pay those costs that accrued as there was production and (2) to pay plaintiffs their royalty "free of expense."
As plaintiffs have acknowledged, the entire proportionate share of production attributable to the leased tracts was applied to the payment of well costs during the existence of the leases, and plaintiffs were paid royalties free of expenses during the existence of the leases. Thus, we conclude that Carden had no further liability for well costs other than those paid out of production during the existence of the leases, costs for which plaintiffs were never held responsible.
Moreover, we find no merit to plaintiffs' contention that Carden somehow remained liable for additional well costs after the leases were released by Exchange. Pursuant to LSA-R.S. 31:128, an assignee or sublessee (Exchange herein) acquires "the rights and powers of the lessee" (Carden herein). Additionally, the leases themselves provide in paragraph 9 that "[a] sublessee may, as to the Lessor, exercise the rights and discharge the obligations of the Lessee, without joinder of any sublessor."
One such right granted to the lessee (or sublessee or assignee) pursuant to the terms of these leases was the right to unilaterally execute a release of the leases at any time, thereby prospectively relieving the lessee of all obligations as to the land leased. See Shanks, 674 So.2d at 478. This provision of the leases specifically provides, in pertinent part, as follows:
3. Lessee, may, at any time prior to or after the discovery and production of minerals on the land, execute and deliver to Lessor or file for record a release or releases of any portion or portions of the lands or any stratum or strata and be relieved of all requirements hereof as to the land, stratum or strata so released[.] (Emphasis added).
Thus, Exchange had the right under the leases to release the lands subject to the leases and thereby prospectively release any continuing obligations of the lessee or sublessee under the leases. See Willis v. International Oil and Gas Corporation, 541 So.2d 332, 334 (La.App. 2nd Cir.1989).
Notably, while Carden, as assignor or sublessor, was not relieved of his obligations or liabilities under the leases by the mere act of conveying his interests in the leases to another, see LSA-R.S. 31:129, once Exchange, as sublessee or assignee, exercised the right to release these interests in the leases pursuant to its rights under LSA-R.S. 31:128 and under the leases herein, then neither Exchange nor Carden had any continuing obligations under the leases to pay well costs that had not yet become due (out of continued production) for these tracts of land. Inasmuch as liability for the remaining unpaid well costs attributable to the tracts of land covered by the leases was a future obligation, i.e., a liability only incurred as the unit well produced and only to the extent of the proportionate share of production, Carden was relieved of this future obligation by execution of the release in accordance with the provisions of the leases. See Shanks, 674 So.2d at 478.
As stated in Shanks, and as acknowledged by plaintiffs in brief, through Exchange's exercise of the right to release the interests in the leases at issue, plaintiffs became unleased landowners of a one-half interest in their tracts. This release entitled them to eight-eighths of production, but also obligated them to pay any prospectively accruing well costs that became *61 chargeable from their proportionate share as the well continued to produce. See Shanks, 674 So.2d at 478. The position taken by plaintiffs would require post termination enforcement of the released leases as to the former lessee's (Carden's) responsibility for drilling costs, but would treat as released or terminated the former lessee's (Carden's) contractual right to seven-eighths of production, a proposition previously described by the United States District Court as "Heads-I win-Tails-you lose." See Browning v. Exxon Corporation, 848 F.Supp. 1241, 1247 (U.S.D.C.M.D.La.), aff'd, 43 F.3d 668 (5th Cir.1994). Clearly, this position cannot prevail.
We conclude, as we did with regard to TXP's liability in Shanks, that the leases granted by plaintiffs imposed no greater obligation for payment of well costs upon Carden than the obligation for costs previously paid. Pursuant to the leases, Carden was obligated to pay costs during the term of the leases and to pay plaintiffs royalties, free of such costs. Moreover, because neither Carden nor Exchange consented to unitization or to the drilling activities of the operating owner, the costs arising during the existence of the leases chargeable to Carden as original lessee, Exchange as sublessee, and TXP by virtue of its acquisition of Exchange's interests in the leases, were only those paid by TXP in the form of one hundred percent of its proportionate share of production prior to termination of these interests in the leases. Thus, TXP has paid all well costs for which it or Carden could have been held liable, see Shanks, 674 So.2d at 478, and Mrs. Carden and the Estate of C.T. Carden accordingly established as a matter of law their entitlement to summary judgment dismissing plaintiffs' claims for any additional well costs.

CONCLUSION
For the above and foregoing reasons, the January 25, 2007 judgment of the trial court dismissing plaintiffs' claims against the Estate of C.T. Carden and Edna Mae Carden is affirmed. Costs of this appeal are assessed against plaintiffs.
AFFIRMED.
HUGHES, J., concurs.
GUIDRY, J., concurs in the result.
NOTES
[1] The remaining one-half interests in the leases were assigned by Carden to Dalco Oil Company on May 13 and August 19, 1976. These one-half interests in the leases eventually passed to Exxon Corporation as sublessee.
[2] Other incidental actions were filed, but they are not the subject of this appeal.
[3] Apparently at some point during these proceedings, C.T. Carden died. Thus, counsel for the Cardens began filing pleadings on behalf of Mrs. Carden and the Estate of C.T. Carden.
[4] We note that defendant Exxon had also filed a motion for summary judgment, contending that as a matter of law, it had no liability to plaintiffs for the well costs it withheld from plaintiffs' share of production. Exxon's motion for summary judgment was granted, and plaintiffs' claims against Exxon were dismissed with prejudice. Thus, plaintiffs' only remaining claims were their claims against the Cardens.
[5] Although not entirely clear from their brief, plaintiffs apparently argue that TXP's liability for well costs was in rem only, i.e., such costs could only be recouped out of production, because TXP did not participate in or consent to unitization. They further argue, however, that Carden's lack of participation in unitization is of no moment, because he personally obligated himself by virtue of the leases to indemnify plaintiffs against all well costs incurred during the existence of the leases.
[6] At the time the compulsory unitization order was rendered herein, the Conservation Statute defined "owner" as "the person who has the right to drill into and to produce from a pool and to appropriate the production either for himself or for others." LSA-R.S. 30:3(8) (prior to amendment by Acts 1993, No. 113, § 1). Carden (and then Exchange and TXP) had the right to drill on plaintiffs' tracts under the leases; thus, Carden was an "owner" for purposes of the Conservation Statute when the leases were executed.
[7] Louisiana Revised Statute 31:129 provides that "[a]n assignor or sublessor is not relieved of his obligations or liabilities under a mineral lease unless the lessor has discharged him expressly and in writing." Thus, because there is no evidence of a written discharge of Carden by plaintiffs, Carden remained liable to plaintiffs under the mineral leases while those leases were in effect.
[8] In order to prevent waste in the recovery of oil and gas from a producing formation located beneath separately owned or leased tracts of land and to protect the rights of each separately owned or leased tract of land, the legislature has granted the Commissioner of Conservation the statutory authority to establish compulsory drilling units. LSA-R.S. 30:4; LSA-R.S. 30:9; LSA-R.S. 30:10. As a result of these compulsory drilling units, a need arose for a rule allocating costs between the unit operator and all non-operating parties who share in the unit's production. Davis Oil Company v. Steamboat Petroleum Corporation, 583 So.2d 1139, 1141-1142 (La. 1991). Thus, the Louisiana Supreme Court pronounced that a non-operating owner or lessee who does not consent to operations within a compulsory drilling unit by a unit operator has no liability for the costs of development and operations except out of his share of production. Davis Oil Company, 583 So.2d at 1143. On the other hand, where an owner or lessee consents to the unit operator's development and operations or takes the initiative to form an operating unit, that owner or lessee will be liable for cash payment in full for his proportionate share of well costs, regardless of proceeds from production. Davis, 583 So.2d at 1144; Superior Oil Company v. Humble Oil & Refining Company, 165 So.2d 905, 910, 910-911 (per curiam on application for rehearing) (La.App. 4th Cir.), writ refused, 246 La. 842, 167 So.2d 668 (1964).
[9] As we noted in Shanks, this principle becomes clearer when considering the fact that although the well costs at issue were incurred during the existence of the leases, they were incurred for a well drilled on land not subject to the leases herein, and before issuance of the unitization order which included the leased lands in the compulsory unit. Thus, Carden clearly had no liability whatsoever for well costs at the time they were incurred either by virtue of law or the leases.